Judi JUSTIANA, Individually and as President of Niagara County Citizens for Choice, Judi's Lounge, Inc., Lawrence V. Soos, Individually and d/b/a Oliver Street Café, Dominic J. Florio, d/b/a DJF Enterprises and Donna's Diner, Garlock's Restaurant, Inc., Steve Dominski, d/b/a Clark's Burgerhouse, Venture's Family Restaurant and Bar, Inc., R.J.L. of Lockport, Inc. and Sheehan, Inc., Plaintiffs,

v.

The NIAGARA COUNTY DEPARTMENT OF HEALTH, David E. Wertman, Public Health Director, Niagara County Board of Health, Barbara A. Brewer, Gerald Deflippo, Linda Flessel, Steven Lewis, Frank Marotta, Robert J. Reszel, Marcia Traverse, Jerome Ulatowki, Jean Wactawski–Wende, and Mitchell Zavon, in their Official Capacities as Members of the Niagara County Board of Health, Defendants.

No. 98–CV–746A.

United States District Court, W.D. New York.

April 2, 1999.

John M. Curran, Albrecht, Maguire, Heffern & Gregg, Buffalo, NY, for plaintiff.

Edward P. Perlman, Lockport, NY, for defendant.

## DECISION AND ORDER

ARCARA, District Judge.

### *Introduction*

On November 23, 1998, plaintiffs filed a complaint seeking a declaratory judgment invalidating regulations adopted by defendant Niagara County Board of Health restricting smoking in certain public places in Niagara County. Defendants filed an answer to the complaint on December 29, 1998.

On February 3, 1999, plaintiffs moved for both a preliminary injunction and summary judgment. On February 19, 1999, defendants made a cross-motion for summary judgment. After carefully considering the parties' arguments, the Court grants the plaintiffs' motion for summary judgment and denies the defendants' motion for summary judgment.

### *Background*

Plaintiffs are individual and corporate owners of restaurants located in Niagara County, New York. Defendants are the Niagara County Board of Health ("the Board"), the individual members of the Board, the Niagara County Department of Health, and the Public Health Director. The Board is an administrative agency created under New York State Public Health Law § 300 to regulate affairs relating to the public health. The Department of Health and the Public Health Director are responsible for enforcing regulations passed by the Board.

Plaintiffs attack the validity of a set of regulations adopted by the Board on September 24, 1998, as amendments to the Niagara County Sanitary Code, which regulate smoking in various indoor facilities open to the public in Niagara County.[1] In order to address the plaintiffs' challenges to the regulations, the Court sets forth the following background to the adoption of the regulations.[2]

The regulation of smoking in New York State dates back to approximately 1975, when the State Legislature adopted a law restricting smoking in a limited number of public areas such as libraries, museums, theaters and public transportation facilities. During the next ten years, the Legislature considered, but did not pass, a variety of more expansive restrictions on smoking in public places.

In late 1986, the Public Health Council ("PHC"), a state administrative agency, adopted its own comprehensive code which placed greater restrictions on smoking in public places and included a number of exemptions for certain types of businesses. However, the New York Court of Appeals, in the case of *Boreali v. Axelrod,* 71 N.Y.2d 1, 517 N.E.2d 1350, 523 N.Y.S.2d 464 (1987), found that the regulations adopted by the PHC were invalid and unenforceable because the PHC exceeded its authority as an administrative agency in adopting the regulations.

---

1. The regulations, as adopted, were scheduled to become effective on March 1, 1999. Defendants have represented to the Court that the regulations will not be enforced until April 30, 1999 to allow for a 60–day period for affected businesses to come into compliance.

2. This background information, taken from the parties' memoranda in support of their respective motions for summary judgment, is uncontested except where otherwise noted.

Following the *Boreali* decision, in 1989, the State Legislature passed the Clean Indoor Air Act ("the Act"), which placed greater restrictions on smoking in public places, to the point of barring or restricting smoking in most commercial establishments. This statute is still in effect. Soon thereafter, the Board adopted Article XVI of the Sanitary Code for the County of Niagara, providing for regulations to enforce the Act, as the Act provides that local boards of health are responsible for its enforcement. As originally enacted, Article XVI of the Sanitary Code, which became effective January 1, 1990, virtually mirrors the Act and does not contain any regulations more restrictive of smoking than those contained in the Act.

With that background in mind, the Court turns to the adoption of the regulations that are the subject of the present litigation. Beginning in approximately April of 1996, the Board began discussions about smoking regulations that would be more restrictive than those provided for in the Act. It is undisputed that from that time until May 19, 1998, the Board had discussions in which the members considered a variety of factors—including social, economic, and political factors, as well as health-related ones—that would be affected by more restrictive smoking regulations. The record is replete with evidence that Board members were concerned with the economic effects of further restrictions on local businesses and attempting to balance these concerns with concerns about the effects of Environmental Tobacco Smoke ("ETS").

The parties disagree, however, as to how the Board's activities between April of 1996 and May of 1998 should be characterized. According to plaintiffs, the Board analyzed these health and non-health-related factors because it initially intended to adopt more restrictive regulations on its own. In contrast, according to defendants,

the Board was taking into consideration social, economic, and political factors, as well as health factors, as the Board's goal was to assist the County Legislature formulate legislation further restricting smoking.[3]

In any event, in July of 1996, the Board formed an *ad hoc* committee consisting of four Board members and members of the Niagara County Smoke–Free Coalition to propose new restrictions. The *ad hoc* committee met and reviewed information about ETS and, notably, about the economic impact of more restrictive smoking regulations on local restaurants. In September of 1996, the *ad hoc* committee adopted a "fact sheet" with information about both the health and economic effects of ETS and its regulation. By November of 1996, the committee had agreed upon a draft of the regulations, and it recommended that the Board conduct four public meetings to receive public input on the proposed regulations.

The Board held the public meetings in February of 1997, at which members of the public voiced their arguments in favor of and against the proposed regulations. Some members of the public argued against the regulations based on their anticipated economic impact on the local economy. According to plaintiffs, the Board determined that the passage of a law containing the restrictions would be preferable to the adoption of regulations. Thus the Board brought the matter to the Legislature's attention. As defendants have characterized these events, however, the Board had always intended for the restrictions to be enacted through legislative action.

In March of 1997, the Board forwarded all the information it had collected to the Niagara County Legislature to provide the Legislature with support to adopt a local law providing for greater restrictions on

---

**3.** As discussed in part 3.B below, this disagreement as to how to characterize the

Board's actions at this time is immaterial.

smoking. Over the course of the next year, the Board negotiated with the Legislature as well as other interest groups, such as business owners, to attempt to arrive at a compromise local law. The Legislature appointed its own committee, referred to as the "ETS Policy Committee," to evaluate the Board's request for a more restrictive smoking law. The ETS Policy Committee was comprised of Board members, legislators, business owners, and other citizens. By November of 1997, the ETS Policy Committee agreed upon a proposed county law.

However, in that same month, elections were held which resulted in a change in the political composition of the County Legislature, with Republican members now numbering in the majority. The newly constituted legislature established another committee—the "Smoking Law Committee"—comprised of members of the Board, legislators, and business owners, to analyze the proposed smoking regulations. By March of 1998, the Smoking Law Committee had drafted a proposed county law, which the Board endorsed.

However, in May of 1998, the Legislature adopted a county law which differed from the law agreed upon by the Smoking Law Committee and recommended by the Board. The county law provided, *inter alia,* for a smoking area within the dining areas of all restaurants "comprising no more than 30% of the total seating capacity of the restaurant" and an exemption from the law for restaurants with "dining areas seating 45 people or less." Niagara County, N.Y., Local Law in Relation to the Regulation of Smoking in Niagara County (May 19, 1998).[4]

The Board was dissatisfied with the law passed by the Legislature. Board members indicated at the Board's May meeting that it would consider taking action on the draft regulations it had originally recommended in December of 1996. In July of 1998, the Board first adopted the regulations at issue in the present case, and made minor changes to them on September 24, 1998.[5]

The regulations prohibit smoking in all public places in Niagara County, except that smoking is allowed in bars, taverns, bar areas of restaurants, and bar areas of bowling alleys. As in the County Law, the regulations do not restrict smoking in private residences, private vehicles, tobacco businesses, hotel and motel rooms, and in "any indoor area where private social functions are being held and when seating arrangements are under the control of the sponsor of such functions and not the owner ...," and smoking is permitted in separate smoking rooms. Regulations § 6.a–e.

The County Law and the Board's Regulations, however, diverge in several respects. The practical differences between the County Law and the Board's Regulations are as follows: (1) the County Law exempts dining areas with forty-five seats or less, while the Board's Regulations do not; (2) the County Law permits smoking in 30% of the dining area of all restaurants; in contrast, the Board's Regulations prohibit smoking in all dining areas, but allow restaurants and bowling alleys with bars to have smoking in the bar area; (3) the County Law permits a waiver from its provisions based on financial hardship, but the Board's Regulations do not provide for any waiver; and (4) under the Board's Regulations, but not under the County Law, restaurants with bars are required to construct a floor to ceiling partition between the bar area of the restaurant and the dining area and have a smoke-free "patron waiting area."

Plaintiffs filed a complaint in this Court on November 23, 1998; an amended complaint naming additional plaintiffs was filed on December 7, 1998. Defendants filed an answer on December 29, 1998. On February 3, 1999, plaintiffs filed the summary judgment motion and motion for a prelimi-

---

**4.** A copy of the County Law is attached to this decision as Appendix A.

**5.** A copy of the Board's Regulations is attached to this decision as Appendix B.

nary injunction presently under consideration. Defendants filed a cross-motion for summary judgment on February 19, 1999, and plaintiffs filed a reply memorandum on February 26, 1999. The Court heard oral argument on the motions on March 4, 1999.

### Discussion

### 1. Subject Matter Jurisdiction

As an initial matter, the Court must address its subject matter jurisdiction over this case. Plaintiffs have set forth two claims. The first claim the Court will address is plaintiffs' claim that the regulations violate the Equal Protection Clause of the Fourteenth Amendment. Second, the Court will address plaintiffs' claim that the defendants violated the non-delegation doctrine by improperly exercising legislative authority.

Plaintiffs have attempted to articulate both claims as those arising under the federal constitution. However, it is clear to the Court that only one of these claims—that defendants violated the equal protection doctrine of the Fourteenth Amendment—truly arises under federal constitutional law. The Court therefore has federal question jurisdiction over the equal protection claim pursuant to 28 U.S.C. § 1331.[6]

■ Plaintiffs' other claim, on which they have relied more heavily throughout these proceedings, is that defendants, in adopting the regulations, exercised legislative power in violation of the non-delegation doctrine. In other words, plaintiffs allege that the regulations are invalid because the Board, an administrative agency, in enacting the regulations exercised legislative power, which only a legislative body may properly do. Plaintiffs have attempted to cloak this argument in federal constitutional language, labeling the alleged violation of the non-delegation doctrine a violation of the right to substantive due process under the Fourteenth Amendment. Plaintiffs provide no legal authority in support of this characterization, and the cases upon which plaintiffs rely to support the merits of this claim are New York state cases[7] and a federal case decided on state law grounds.[8] Moreover, this claim addresses the separation of powers among state entities; it is difficult to see how this claim could be one of federal constitutional concern. In sum, it is patently clear that this claim is truly one of state law. Thus, the Court does not have original subject matter jurisdiction over this claim.

The Court is now faced with the question of whether it should exercise supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367. The Court may exercise supplemental jurisdiction over the state law claim as it has original jurisdiction over the equal protection claim, and the state law claim is "so related to the claim[ ] in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. But the Court may decline to exercise supplemental jurisdiction over a claim if:

> (1) the claim raises a novel or complex issue of State law,

**6.** Although the equal protection claim is the only claim over which the Court has original jurisdiction, plaintiffs have urged the Court not to reach this claim, but instead to decide the case based on the non-delegation claim, which is based on state law—a rather precarious position to assume while encouraging the Court to assert its jurisdiction over this matter.

**7.** Primarily, plaintiffs rely on *Boreali v. Axelrod*, 71 N.Y.2d 1, 523 N.Y.S.2d 464, 517 N.E.2d 1350 (N.Y.1987), discussed *infra*.

**8.** *See Nassau Bowling Proprietors Ass'n v. County of Nassau*, 965 F.Supp. 376, 378 (E.D.N.Y.1997) ("Because the issue of the legality of the [smoking] Ordinance under New York law is a threshold issue which, if decided in favor of the Plaintiffs, would obviate the need to reach the constitutional issues, the Court focuses its discussion on that issue.").

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

■ As discussed below, the Court finds that plaintiffs' equal protection claim is without merit, although it is not frivolous. In light of the weakness of the federal constitutional claim in relation to the state law claim, the Court has the discretion to decline to exercise supplemental jurisdiction over plaintiffs' state law claim pursuant to § 1367(c)(2) or (3). However, the Court in its discretion has determined that it is appropriate to exercise its supplemental jurisdiction over plaintiffs' state law claim for several reasons related to judicial economy, convenience, fairness, and comity. First, looking at concerns of comity, the Court notes that the state law claim deals with an issue which the New York Court of Appeals has squarely addressed, so that the Court is not facing a situation in which state law is unclear. Thus, if the Court decides the merits of this state law claim, the result should be the same as if the claim were decided by a state court. Second, this case presents a somewhat unusual circumstance in that the determination of plaintiffs' claims is highly time-sensitive, as defendants will begin enforcing the challenged regulations on April 30, 1999. Declining supplemental jurisdiction over the state law claim would substantially delay any determination in this matter and result in unfairness to the litigants. Third, the Court has already expended the resources necessary to become familiar with the legal and factual issues involved in this case and no further litigation must be pursued to deal with the state law claim, so considerations of judicial economy weigh in favor of retaining jurisdiction.

In light of these considerations, the Court will exercise its supplemental jurisdiction over plaintiffs' state law claim. *See Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("the doctrine of pendent jurisdiction thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values."); *Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1054–55 (2d Cir.1990) (finding district court did not err in denying dismissal of state law claims after federal claims dismissed, where unique circumstances of case favored retention of jurisdiction).

### 2. *Summary Judgment*

Plaintiffs have moved for both a preliminary injunction and for summary judgment, while defendants have moved for summary judgment. After plaintiffs made their motion for a preliminary injunction, defendants represented to the Court that the challenged regulations would not be enforced for a period of sixty days [9] following their effective date lessening the need for immediate relief. The parties have also represented to the Court that the record is complete for purposes of summary judgment. Thus, the Court will decide the parties' motions for summary judgment rather than the plaintiffs' motion for preliminary injunction, which by virtue of this decision is moot.

A moving party is entitled to summary judgment if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In other words, the moving party is entitled to summary judgment where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**9.** Thus the regulations would not be enforced until April 30, 1999.

Once a motion for summary judgment has been made and supported, the nonmoving party may not rest on mere allegations, but must set forth proof of specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

In deciding a motion for summary judgment, the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, on a motion for summary judgment, a court cannot try issues of fact; it can only determine whether there are issues to be tried. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987).

### 3. *The Merits of the Parties' Arguments*

#### A. *Equal Protection Claim*

■ Plaintiffs claim that the Board's Regulations violate the Equal Protection Clause of the Fourteenth Amendment because they arbitrarily exempt certain businesses from compliance with the smoking restrictions. Plaintiffs contend that if the goal of the regulations is to protect the public health, it is irrational to restrict smoking in some public places but not others, as members of the public will still be exposed to the harmful effects of ETS.

Under equal protection law, if a classification "neither burdens a fundamental right nor targets a suspect class," the classification will be upheld "so long as it bears a rational relation to some legitimate end." *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996). Legislative classifications do not have to be a "perfect fit" for the problem they are

intended to address in order to survive rational basis review. Accordingly, a legislature can address a perceived problem incrementally if in its judgment that is the best way to address the problem. As the Supreme Court has noted:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.

*F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 316, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (citing *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955)). *See also Brazil–Breashears v. Bilandic,* 53 F.3d 789, 793 (7th Cir.1995) ("the government ... need not comprehensively attack an identified vice: it 'must be allowed leeway to approach a perceived problem incrementally.' ... This is true regardless of the probability that the government will ever address the rest of the problem.") (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).

Applying this rational basis review to the facts of this case, plaintiffs' claim fails to state an equal protection violation. Protecting the public from the dangers of ETS is certainly a legitimate end, which plaintiffs do not dispute. Furthermore, plaintiffs have not shown that the Board's Regulations are not rationally related to this end, as restricting smoking in public places is clearly rationally related to the goal of protecting the public from ETS. And, under the case law discussed above, the Board does not act irrationally by address-

ing the problems presented by ETS one step at a time—that is, by restricting smoking in some public places rather than others. Therefore, plaintiffs' equal protection claim is without merit.

### B. *Non–Delegation Claim under State Law*

The Court now turns, in exercising its supplemental jurisdiction, to plaintiffs' state law claim, which deals with the non-delegation doctrine as it relates to the separation of powers among state governmental bodies. The starting point for the analysis of plaintiffs' non-delegation claim is the Court of Appeals' decision in *Boreali v. Axelrod*, 71 N.Y.2d 1, 517 N.E.2d 1350, 523 N.Y.S.2d 464 (1987). In *Boreali*, as discussed briefly above, the Public Health Council ("PHC"), an administrative agency, promulgated regulations prohibiting smoking in a wide variety of public facilities following several years of failed attempts by members of the state legislature to further restrict smoking through new legislation. The New York Court of Appeals found the regulations invalid, stating that although the PHC was authorized by the Public Health Law to regulate matters affecting the public health, "the agency stretched that statute beyond its constitutionally valid reach when it used the statute as a basis for drafting a code embodying its own assessment of what public policy ought to be." *Id.* at 9, 523 N.Y.S.2d 464, 517 N.E.2d 1350. The Court reasoned that even where an enabling statute delegating power to an agency is itself valid, the agency's actions pursuant to the enabling statute are invalid if the agency assumes the legislature's role of exercising "the open-ended discretion to choose ends." *Id.* at 11, 523 N.Y.S.2d 464, 517 N.E.2d 1350.

The Court relied on four factors in finding that the PHC's regulations were an invalid exercise of legislative power. First, the Court found the PHC had engaged in the balancing of competing concerns of public health and economic costs, "acting solely on [its] own ideas of sound public policy." *Id.* at 12, 523 N.Y.S.2d 464, 517 N.E.2d 1350. Second, the PHC did not engage in the "interstitial" rule-making typical of administrative agencies, but had instead written "on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance." *Id.* at 13, 523 N.Y.S.2d 464, 517 N.E.2d 1350. Third, the PHC's regulations concerned "an area in which the legislature had repeatedly tried—and failed—to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions." *Id.* The Court found that separation of powers principles mandated that elected legislators rather than appointed administrators "resolve difficult social problems by making choices among competing ends." *Id.* Fourth, the Court found the agency had overstepped its bounds because the development of the regulations did not require expertise in the field of health. *Id.* at 14, 523 N.Y.S.2d 464, 517 N.E.2d 1350.

Plaintiffs argue that under the principles set forth in *Boreali*, the Board's regulations are invalid as the Board, like the PHC, engaged in a legislative process in enacting the regulations, which, as an administrative agency, it may not do. Defendants, on the other hand, claim that the enactment of the regulations was a valid exercise of the agency's power as derived from the Public Health Law.

The Court finds that under the principles set forth in *Boreali*, the Board violated the non-delegation doctrine of New York State law in enacting the regulations. Looking at the first factor, the record establishes that the Board engaged in the legislative function of balancing economic factors with competing health considerations in crafting the regulations. The Court is not persuaded by defendants' argument that at the time the Board was considering non-health factors, it was acting solely to help the Legislature formulate appropriate legislation. It is far from

clear from the record that the Board was only assisting the Legislature at this time.

And regardless of the Board's actions prior to the Legislature's passage of the less restrictive law, the Board's actions after this point show the Board considered non-health factors in adopting the regulations. Defendants argue that the regulations reflect the fact that after the Legislature passed the law, the Board only considered factors relating to health. For example, defendants contend that the regulations require a partition between smoking and non-smoking areas—while the state and county legislation allow these areas to be contiguous—based solely on the health consideration that smoke will travel between contiguous smoking and non-smoking areas. In making this argument, however, defendants oversimplify the non-health considerations underlying all the challenged smoking regulations. These regulations necessarily have a serious economic impact—for example, restaurant owners must undertake construction in order to comply with the partition regulation, or else they must disallow smoking in their restaurants, which they fear will result in a loss of business. If defendants characterize this regulatory decision as based solely on health considerations, the Board could ban smoking altogether, claiming it only considered the harmful effect of ETS, as long as it was careful to not mention any non-health considerations on the record. But in making such a decision Board members would necessarily have to take into account non-health considerations. .

Defendants also argue that the fact that the regulations restrict smoking in certain establishments and not others—for example, in restaurants, but not in bars—does not reflect any weighing of economic factors by the Board. Defendants contend that these classifications were put in place by the Clean Indoor Air Act, by which the State Legislature preempted regulation of smoking by other government bodies with respect to certain types of establishments, such as bars. Thus, defendants argue, the Board did not restrict smoking in certain establishments not because of economic considerations, but because the Board was preempted from doing so.

The Court finds this argument without merit in light of the express language of the Act, which provides that "nothing herein shall be construed to restrict the power of any county, city, town or village to adopt and enforce additional local law, ordinances, or regulations which comply with at least the minimal standards set forth in this article." Public Health Law § 1399–r. Clearly the Act does not bar a government body, acting within the scope of its authority, from adding greater restrictions on smoking than those provided for in the Act.

Turning to the second factor in *Boreali,* the Court of Appeals found the PHC had exceeded its authority by writing "on a clean slate" rather than using its regulatory powers to fill in the details of a legislative scheme. Defendants argue that this factor works in the Board's favor, as the present case is distinguishable from *Boreali* because since that case was decided, the State Legislature passed the Clean Indoor Air Act, and the Board was simply filling in the interstices of the Act's provisions. This argument, however, is not persuasive in the context of smoking regulations, an area which the Court of Appeals described in *Boreali* as one especially suited for legislative determination as it involves "difficult social problems" which must be resolved "by making choices among competing ends." *Id.* at 13, 523 N.Y.S.2d 464, 517 N.E.2d 1350. *See also Nassau Bowling Proprietors Assoc. v. County of Nassau,* 965 F.Supp. 376 (E.D.N.Y.1997) (invalidating county health agency's smoking ordinance under the Boreali test where agency acted after passage of Clean Indoor Air Act). In this context, even where the state legislature has provided some guidance for the restriction of smoking, the enactment of further substantive restrictions is a task

properly left to the legislative arm of government. By adopting regulations that are substantially more restrictive than existing legislation, the Board went beyond interstitial rule-making and into the realm of legislating.

The third *Boreali* factor weighs particularly heavily in favor of invalidating the regulations. The Court found that the PHC had overstepped its bounds because its regulations concerned "an area in which the legislature had repeatedly tried—and failed—to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions." *Boreali*, 71 N.Y.2d at 13, 523 N.Y.S.2d 464, 517 N.E.2d 1350. The record here presents a strikingly similar situation, as the County Legislature debated the very provisions at issue and declined, after considering public debate, to make them law. If anything, the Board's actions here were even more egregious than the PHC's because the Board had worked with the Legislature in drafting the regulations the Legislature ultimately rejected, evidencing that the Board took part in legislative activity. For the Board to immediately thereafter take those rejected provisions and adopt them as rules contravenes the legislative process, which is the proper mechanism for making such difficult decisions of public policy.

Defendants argue that the Board did not exceed its authority by adopting regulations containing, in part, the same restrictions as the provisions rejected by the Legislature. Defendants contend that in matters relating to health, the Board may override the Legislature as the Board's authority is derived from state law, and the Legislature is a governmental body on the county level. It is unclear from the record developed by defendants exactly how much authority the Board is given by state law. However, even presuming that the Board is an arm of the state government, and generally in matters of health has authority superior to that of the county government, this argument is unavailing

in this context. Where the regulation of smoking is concerned, the New York Court of Appeals has made clear that health concerns are so intertwined with economic and social concerns that the Board may not override the Legislature, whatever its authority to do so in other instances may be.

The fourth and final *Boreali* factor requires the Court to examine whether the development of the regulations required expertise in the field of health. Defendants have argued that the members of the Board have a great deal of medical and scientific expertise, which they called upon in adopting the regulations. The Court notes, however, that in *Boreali*, the Court of Appeals found that the development of smoking regulations did not require any special medical or scientific expertise. *See id.* at 14, 523 N.Y.S.2d 464, 517 N.E.2d 1350. Moreover, no special expertise is needed to understand the hazards of exposure to ETS; in fact, it is well known to those outside the scientific community that such exposure may lead to the development of serious health problems. The Court finds, therefore, that this factor also weighs in favor of invalidating the Board's regulations.

Before concluding, the Court adds that nothing in this decision is intended to express an opinion on the wisdom of more restrictive smoking regulations, provided that they are enacted by a governmental body with the authority to do so. And, of course, the Board remains free to attempt to persuade the Legislature to duly enact more restrictive smoking laws, in light of the health concerns expressed by the Board.

### Conclusion

The Court finds that the Board's Regulations are invalid and thus grants plaintiffs' motion for summary judgment and denies defendants' motion for summary judgment; plaintiffs' motion for a preliminary injunction is moot. Accordingly, defendants are hereby enjoined from enforcing the regulations against plaintiffs. The

Clerk of Court is ordered to take all steps necessary to close this case.

IT IS SO ORDERED.

## APPENDIX "A"

FROM: Health Services & Education   DATE:   5/19/98   RESOLUTION #   H5-037-98
Committee                                                              (Amended)

APPROVED                          COMMITTEE ACTION   LEGISLATIVE ACTION
NIAGARA CO. ATTORNEY_____   Approved:  Ayes _____  Abs. _____  Noes ___3___
_____   Rejected:  Ayes _____  Abs. _____  Noes _____
By _____   Referred: _____

### ADOPTION OF LOCAL LAW IN RELATION TO THE REGULATION OF SMOKING IN NIAGARA COUNTY

WHEREAS, the Health Services & Education Committee recommends the adoption of the following Local Law:

A Local Law in Relation to the Regulation of Smoking in Niagara County; and

WHEREAS, a public hearing was held on May 5, 1998 at 6:00 p.m. in the Legislative Chambers, Courthouse, Lockport. New York, on said Local Law, and

WHEREAS, many people appeared to speak on said Local Law, and

WHEREAS, two amendment(s) was (were) made to said Local Law, now, therefore, be it

RESOLVED, that a Local Law regulating smoking in Niagara County be enacted by the County Legislature of the County of Niagara, as follows:

*Section I.  Legislative Intent.*

The Niagara County Legislature finds and determines that the health of the public is seriously threatened by exposure to environmental tobacco smoke (ETS). The Legislature also determines that recent findings by the Federal Environmental Protection Agency (EPA) make clear that ETS, or secondhand smoke, is a human carcinogen belonging in the category of Group A (known human) carcinogens.

The EPA has concluded that exposure to ETS increases the risks of respiratory and middle ear diseases in children, contributing to between 150,000 – 300,000 cases of bronchitis and pneumonia in infants and young children each year. Further, exposure to ETS significantly worsens the condition of up to 1,000,000 asthmatic children and contributes to new cases of asthma in once-healthy children.

The Legislature further finds that reliable studies have shown that primary tobacco use is a major cause of mortality and morbidity, directly causing an estimated 434,000 deaths per year in the United States, more deaths than are caused by the use of any other legal or illegal substance or drug. In addition, ETS is the number three cause of death in the United States, being responsible for over 53,000 deaths.

Moreover, the Legislature concurs in the finds of the EPA that exposure to ETS can pose substantial health risks to children, as it is causally associated with, among other things, increases in the prevalence of childhood respiratory illnesses, increases in the prevalence of fluid in the middle ear of children, and a statistically significant reduction in the lung function of children. The Legislature also concurs in the EPA's findings that ETS results in additional episodes and increased severity of asthma in children who suffer from this disease, and is a risk factor for new cases of asthma in children who have not previously displayed asthmatic symptoms.

The EPA reports that twenty-six percent of the population of the United States, or about 50 million Americans, are

smokers. As the Legislature finds that Americans, including all citizens of Niagara County, are likely to be exposed to ETS by virtue of its widespread presence in public places and in the workplace, and that exposure to ETS presents a substantial and serious health risk to nonsmokers, it is the purpose of the Legislature to limit smoking throughout Niagara County in order to protect the people of the county from the health risks of smoking. The Legislature is therefore placing further prohibition on smoking in public places and in the workplace.

*Section 2. Definitions.*

a. "Bar" and "Tavern" means any establishment open to the public, devoted to the sale and service of alcoholic beverages for on-premises consumption, where the service of food is merely incidental to the operation of the business, and for which the sale of food for on-premises consumption does not exceed 40% of annual gross sales.

b. "Bar Area" means an area of Restaurant with Bars within a maximum of 15 feet of the bar where the service of alcoholic beverages for on-premises consumption takes place.

c. "Business" means any sole proprietorship, partnership, joint venture, corporation, or other business entity whether for profit or not-for-profit, including retail establishments where goods or services are sold as well as professional corporations, social agencies and other entities where legal, medical, dental, engineering, architectural, or other professional services are delivered.

d. "Employee" means any person who is employed by any employer for direct or indirect monetary wages or profit, and any person who volunteers his or her services for a non-profit entity.

e. "Employer" means any person, partnership, corporation, including a municipal corporation, or non-profit entity who employs the services of one or more individual persons.

f. "Place of Employment" means any area under the control of a public or private employer which employees normally frequent during the course of employment, including but not limited to work areas, employee lounges and restrooms, conference and classrooms, employee cafeterias, and hallways. A private residence is not a "place of employment" except when it is used for a business.

g. "Public Place" means any area to which the public is invited or in which the public is permitted, including but not limited to banks, educational facilities, health facilities, laundromats, public transportation facilities, reception areas, restaurants, retail food production and marketing establishments, retail service establishments, retail stores, theaters, and waiting rooms and places of worship. Areas in a private residence which constitute common areas of a multiple dwelling are "public places" within the meaning of this Local Law.

h. "Restaurant" means any coffee shop, cafeteria, sandwich shop or private or public school cafeteria, and any other eating establishment which gives or offers for sale food to the public, guests, or employees, as well as kitchens in which food is prepared on the premises for serving elsewhere, including catering facilities.

i. "Dining area" means any area in a restaurant where people dine except the bar area of a restaurant with a bar.

j. "Separate Smoking Room" means an enclosed room in which smoking is permitted. Such room shall:

(1) be clearly designated as a separate smoking room;

(2) be completely enclosed on all sides by floor to ceiling walls, interior doors and/or windows which must remain closed except for entry and exit of persons to/from the room;

(3) contain adequate means of extinguishing fires consistent with Code; and

(4) have a ventilation system whereby the air from the enclosed room is immediately exhausted to the outside in such a way as to prevent the reintroduction of smoke into the building and must prevent backstreaming of smoke into smoke free areas. Such room may contain one or more doors, provided that the doors remain closed except for the purpose of entry and exit. These doors must be equipped with self-closing devices. Such room may not contain the sole means of entry and exit to the restrooms or any other smoke free area.

k. "Service Line" means any indoor line at which one (1) or more persons are waiting for or receiving service of any kind, whether or not such service involves the exchange of money.

l. "Smoking" means to inhale or exhale the smoke of burning tobacco or tobacco substitute and also to carry burning tobacco or tobacco substitute in the form of a cigarette, cigar, or any other smoke producing device including pipes.

m. "Sports Arena" means any enclosed sports-pavilion, including concourses, gymnasium, health spa, boxing arena, swimming pool, roller or ice skating rink, and other similar places. This term also applies to places where the general public assembles either to engage in physical exercise, participate in athletic or recreational activity, to witness sports, cultural, recreational or similar activities.

n. "Private social function" shall mean any weddings, parties, testimonial dinners, or other similar gatherings in which the seating arrangements are under the control of the organizer or sponsor of the event and not the person who owns, manages, operates, or otherwise controls the use of the place in which the function is held.

o. "Significant Alterations" shall be defined as any change, re-arrangement or addition to a building that requires a building permit under the New York State Uniform Code, exceeds $10,000.00 in cost and deals with building structural features or any modification that affects health, fire safety, or structural safety and exceeds $10,000.00 in cost.

*Section 3. Application of Article to Government Owned and/or Operated Facilities.*

All enclosed facilities owned or leased by Niagara County and any political subdivision of the County shall be subject to the provisions of this article.

*Section 4. Regulation of Smoking in Public Places.*

a. Smoking shall be prohibited in all public places within Niagara County, unless otherwise provided by this Local Law, including but not limited to the following places:

1. Elevators.

2. Buses, taxicabs, and other means of public transit, and ticket, boarding, and waiting areas of public depots.

3. Public restrooms.

4. Service lines.

5. Retail Stores.

6. All areas available to and customarily used by the general public in all businesses and non-profit entities patronized by the public, including but not limited to professional and other offices, banks, laundromats, hotels, and motels.

7. Aquariums, galleries, libraries, and museums.

8. Any facility which is primarily used for exhibiting any motion picture, stage, drama, lecture, musical recital, or other similar performance.

9. Every room, chamber, place of meeting or public assembly, including school buildings, under the control of any board, council, commission, committee, including joint committees, or agencies of the County or any political subdivision of the County.

10. Hospitals, clinics, physical therapy facilities, doctors' offices, dentists' offices and any other health facility.

11. Lobbies, hallways, and other common areas in apartment buildings, condominiums, retirement facilities, nursing homes, and other multiple-unit residential and commercial facilities.

12. Polling places.

13. Places of worship.

14. Dining areas of private clubs when open to the public.

b. All Public Places are encouraged to immediately provide a smoke free environment; however, smoking may be permitted, with certain limitations as provided in various sections of this Local Law including, but not limited to. Separate Smoking Rooms or in the following areas and locations:

1. Restaurants with Bars.

Effective 90 days from the enactment of this Local Law, Restaurants with Bars may allow smoking in Bar Areas of the restaurant and in a designated area of the restaurant comprising no more than 30% of the total seating capacity of the restaurant. This section shall not apply to dining areas seating 45 people or less.

2. Restaurants without Bars.

Effective 90 days from the enactment of this Local law, Restaurants without Bars may allow smoking in a designated area of the restaurant comprising no more than 30% of the total seating capacity of the restaurant. This section shall not apply to dining areas seating 45 people or less.

3. Bars and Taverns. Smoking may be permitted. Proper ventilation is encouraged to reduce exposure to environmental tobacco smoke.

4. Sports Arenas. Indoor facilities shall be smoke free. With concurrence of the entities that own and operate the facility, separate smoking rooms may be provided for patrons who wish to smoke.

5. Bowling Centers. Effective 90 days from the enactment of this Local Law:

(a) No smoking is permitted in the "settee" area;

(b) Smoking in dining areas of a bowling center shall be consistent with the applicable provisions of this Local Law governing Restaurants with Bars and Restaurants without Bars;

(c) Smoking may be permitted in the concourse area of a bowling center, provided that such area consists solely of adults in league or tournament play. Open bowling is smoke free. Smoking may be permitted to continue during adult league bowling with open bowling in progress in the remaining portion of the bowling center provided the open

bowling allowed at that time is undertaken exclusively by adults, and adult league bowling patrons are separated from open bowling patrons by a space of no less than four bowling lanes;

(d) Before 6:00 p.m., if a Minor (under 18 years of age) is present anywhere on the premises, no smoking shall be permitted in any area of the bowling center, unless the Minors are provided a designated separate smoke free Enclosed Area; and

(e) Regardless of the bowling activities undertaken at the time, a bowling center must designate at least one third of the concourse area as smoke free.

6. Convention Halls. Effective 90 days from the enactment of this Local Law, convention halls shall be smoke-free. A separate smoking room may be provided.

c. This section shall not prohibit smoking in separate smoking rooms as defined in Section 2(j).

d. Notwithstanding any other provision of this section, any owner, operator, manager, or other person who controls any establishment or facility may declare that entire establishment or facility as a non-smoking establishment.

*Section 5. Regulation of Smoking in Places of Employment.*

a. It shall be the responsibility of employers to provide a smokefree workplace for all employees, but employers are not required to incur any expense to make structural or other physical modifications and shall be subject to the provisions of any existing labor agreements.

b. Within 90 days of the effective date of this article, each employer having any enclosed place of employment located within the County shall adopt, implement, make known, and maintain a written smoking policy which shall contain the following requirements: Smoking shall be prohibited in all enclosed facilities within a place of employment without exception. This includes common work areas, auditoriums, classrooms, conference and meeting rooms, private offices, elevators, hallways, medical facilities, cafeterias, employee lounges, stairs, restrooms, vehicles occupied by more than one person, and all other enclosed facilities.

c. The smoking policy shall be communicated to all employees at least three (3) weeks prior to its adoption.

d. This section shall not prohibit smoking in separate smoking rooms as defined in Section 2(j).

*Section 6. Where Smoking is Not Regulated.*

Notwithstanding any other provision of this Local Law to the contrary, the following shall not be subject to the smoking restrictions contained in this Local Law:

a. Private residences.

b. Private vehicles.

c. Tobacco businesses.

d. Any indoor area where private social functions are being held and when seating arrangements are under the control of the sponsor of such functions and not the owner, operator, manager or person in charge of such indoor area.

e. Hotel and motel rooms, unless otherwise regulated by management.

*Section 7. Waiver.*

The Niagara County Legislature shall appoint a Waiver Committee composed of the Public Health Director or his or her designee, a Legislator, a Board of Health Member, a restaurant owner and a representative of the business community. This Committee may grant a temporary or per-

manent waiver if compliance with specific provisions herein contained would cause undue financial hardship, if other factors would render compliance unreasonable, or if the goals of this Local Law can be shown to be met through the use of technology. A written request for a waiver is required, and such request must clearly establish that compliance with a specific provision of this Local Law would cause the applicant undue hardship or that other factors exist which would render strict compliance unreasonable. Temporary waivers shall be valid for a period of not more that twenty-four months and may be renewed upon written reapplication.

Reapplication waivers may be granted for periods of time as deemed appropriate by the Committee, but in no case longer than sixty months. Waivers may be transferred with the sale of any establishment regulated by this Local Law, provided that the use remains unchanged and the physical configuration of the premises remains substantially unaltered. No fee will be charged for application for a waiver.

*Section 8. Application of Article to New Construction, and Conversion, and Addition and Alteration of Existing Buildings.*

a. Full compliance with this regulation must be achieved for new construction, and for conversions, significant additions and significant alterations of existing buildings covered by this regulation. No waiver shall be granted for these circumstances.

b. For new construction and for conversions, significant additions and significant alterations of existing buildings covered by this regulation, areas where smoking is permitted may not be the sole means of entry and exit from the facility or its restrooms or any other smoke free area, and may not be the sole waiting area for the facility.

*Section 9. Posting of Signs*

a. "No Smoking" signs or the international "No Smoking" symbol (consisting of a pictorial representation of a burning cigarette enclosed in a red circle with a red bar across it), shall be clearly, sufficiently, and conspicuously posted at each entrance to every building or other facility where smoking is prohibited.

b. "Smoking Permitted in Designated Areas Only" signs shall be clearly, sufficiently, and conspicuously posted at each entrance to every building or other facility where smoking is permitted.

*Section 10. Notice and Enforcement.*

a. Any owner, manager, operator, or employee of any establishment regulated by this Local Law shall inform persons violating this Local Law of the appropriate provisions hereof.

b. Any citizen may register a complaint under this Local Law to the Niagara County Health Department, Environmental Health Section.

c. The Niagara County Health Department shall be charged with enforcement of this Local Law. The Public Health Director is authorized to issue all notices, orders and other processes that may be necessary in the enforcement of this Local Law.

d. Upon written notice of a violation of any provision of this Local Law, or of the rules and regulations promulgated hereunder, the Public Health Director shall cause a hearing to be held in accordance with Section 5 of Chapter 1 of the Niagara County Sanitary Code.

*Section 11. Violations and Penalties.*

a. It shall be a violation for any person who owns, manages, operates, or otherwise controls the use of any premises subject to regulation under

this Local law to fail to request compliance with any of its provisions.

b. It shall be a violation for any person to smoke in any area where smoking is prohibited by the provisions of this Local Law.

c. Any person who violates any provision of this Local Law shall be guilty of a violation punishable by a fine not to exceed five hundred dollars ($500.00).

*Section 12.  Rules and Regulations.*

The Public Health Director may promulgate such rules and regulations as necessary to carry out the provisions of this Local Law, provided that the Legislature, by simply majority, has not voted to disapprove such rule or regulation within sixty days from the Public Health Director's written notice to the Legislature that such rule or regulation has been promulgated.

*Section 13.  Nonretaliation.*

No person or employer shall discharge, refuse to hire, or in any manner retaliate against any employee or applicant for employment because such employee or applicant exercises any right to a smoke free environment afforded by this Local Law.

This Local Law shall not be interpreted or construed to permit smoking where it is otherwise restricted by other applicable laws.

*Section 14.  Severability.*

If any provision, clause, sentence, or paragraph of this Local Law or the application thereof to any person or circumstances shall be held invalid, such invalidity shall not affect the other provisions of this Local Law which can be given effect without the invalid provision or application, and to this end the remaining provisions of this Local Law are declared to be valid.

*Section 15.  General Exceptions.*

Regardless of the nature or type of facility, smoking may be permitted in a Separate Smoking Room if the room is:

a. Clearly designated as a separate smoking area;

b. Separate, enclosed and ventilated to the outdoors;

c. Contains adequate means of extinguishing fires;

d. Doors are equipped with self-closing devices so as to remain closed except for purposes of entry and exit from the room;

e. Not the sole entry area to or exit area from the facility or its restrooms;

f. Not the sole waiting area for the facility;

g. Signs are posted as provided in Section 8(b) indicating that smoking is permitted within the establishment, and within the designated areas only;

h. In Restaurants with Bars and Restaurants without Bars, said Separate Smoking Room may be utilized for full service dining, but may not comprise more than 50% of the total seating capacity of the restaurant.

*Section 16.  Interpretation.*

Nothing in this Local Law shall be construed to create a cause of action by one person against another person for violation of any provision of this Local Law.

*Section 17.  Effective date.*

Unless specifically stated otherwise within this Local Law, the effective date of this legislation shall be 90 days from the enactment of this Local Law.

*Section 18.  Review Committee.*

No later than one year after enactment of this Local Law, the Niagara County Smoking Law Committee of the Health Services Committee shall reconvene as a Review Committee to evaluate this Local Law. Within six months after reconvening, the Committee must provide the Legislature with its findings and/or recommendations with respect to this Local Law.

/s/ signature illegible

HEALTH SERVICES & EDUCATION COMMITTEE

Resolution appears as amended

## APPENDIX "B"

Filed New York State Dept. of Health
Date 10/13/98

Be it enacted by the County Board of Health of the County of Niagara, as follows:

*Section 1. Legislative Intent.*

A provision of the Niagara County Sanitary Code to replace Chapter XVI of the Niagara County Sanitary Code in relation to the regulation of smoking in Niagara County.

The Board of Health finds and determines that the health of the public is seriously threatened by exposure to environmental tobacco smoke (ETS). The Board of Health also determines that recent findings by the Federal Environmental Protection Agency (EPA) make clear that ETS, or secondhand smoke, is a human carcinogen belonging in the category of Group A (known human) carcinogens. Secondhand smoke is a known cause of premature death and disease, including lung cancer and heart disease, in otherwise healthy nonsmokers.

The EPA has concluded that exposure to ETS increases the risks of respiratory and middle ear diseases in children contributing to between 150,000 – 300,000 cases of bronchitis and pneumonia in infants and young children each year. Further, exposure to ETS significantly worsens the condition of up to 1,000,000 asthmatic children and contributed to new cases of asthma in once-healthy children.

The Board of Health concurs in the findings of the EPA that exposure to ETS can pose substantial health risks to children, as it is causally associated with, among other things, increases in the prevalence of childhood respiratory illnesses, increases in the prevalence of fluid in the middle ear of children, and a statistically significant reduction in the lung function of children. The Board of Health also concurs in the EPA's findings that ETS results in additional episodes and increased severity of asthma in children who suffer from this disease, and is a risk factor for new case of asthma in children who have not previously displayed asthmatic symptoms.

The EPA reports that twenty-six percent of the population of the United States, or about 50 million Americans, and smokers. As the Board of Health finds that Americans, including all citizens of this County, are likely to be exposed to ETS by virtue of its widespread presence in public places and in the workplace, and that exposure to ETS presented a substantial and serious health risk to nonsmokers, it is the purpose of the Board of Health to limit smoking throughout Niagara County in order to protect the people of the county, especially the children, from the health risks of exposure to ETS. The Board of Health is therefore placing further prohibition on smoking in public places and in the workplace.

*Section 2. Definitions.*

a. "Bar" and "Tavern" means any establishment open to the public, devoted to the sale and service of alcoholic beverages for on-premises consumption, where the service of food is merely incidental to the operation of the business, and for which the sale of food for on-premises consumption does not exceed 40% of annual gross sales.

b. "Bar Area" means an area of a restaurant or other facility within a maximum of 15 feet of the physical bar where the service of alcoholic beverages for on-premises consumption takes place.

c. "Business" means any sole proprietorship, partnership, joint venture, corporation, or other business entity whether for profit or not-for-profit, including retail establishments where goods or

services are sold as well as professional corporations, social agencies and other entities where legal, medical, dental, engineering, architectural, or other professional services are delivered.

d. "Employee" means any person who is employed by any employer for direct or indirect monetary wages or profit, and any person who volunteers his or her services for a non-profit entity.

e. "Employer" means any person, partnership, corporation, including a municipal corporation, or non-profit entity who employs the services of one or more individual persons.

f. "Place of Employment" means any area under the control of a public or private employer which employees normally frequent during the course of employment, including but not limited to work areas, employee lounges and restrooms, conference and classrooms, employee cafeterias, and hallways.

g. "Public Place" means any indoor area to which the public is invited or in which the public is permitted, including but not limited to banks, educational facilities, health facilities, laundromats, public transportation facilities, reception areas, restaurants, retail food production and marketing establishments, retail service establishments, retail stores, theaters, and waiting rooms and places of worship. Areas in a private residence which constitute common areas of a multiple dwelling are "public places" within the meaning of this regulation.

h. "Restaurant" means any coffee shop, cafeteria, sandwich shop or private or public school cafeteria, and any other eating establishment which gives or offers for sale food to the public, guests, or employees, as well as kitchens in which food is prepared on the premises for serving elsewhere, including catering facilities.

i. "Dining area" means any area in a restaurant where people dine except the bar area of a restaurant with a bar.

j. "Separate Smoking Room" means an enclosed room in which smoking is permitted. Such room shall:

(1) be clearly designated as a separate smoking room;

(2) be completely enclosed on all sides by floor to ceiling walls, interior doors and/or windows which must remain closed except for entry and exit of persons to/from the room;

(3) contain adequate means of extinguishing fires consistent with applicable fire prevention and building codes; and

(4) have a ventilation system whereby the air from the enclosed room is immediately exhausted to the outside in such a way as to prevent the reintroduction of smoke into the building and must prevent back streaming of smoke into smoke free areas. Such room may contain one or more doors, provided that the doors remain closed except for the purpose of entry and exit. These doors must be equipped with self-closing devices. Such room may not be the sole entry area to or exit area from the facility, nor be the sole waiting area for the facility. Such room also may not exceed 50% of the capacity of the facility.

k. "Service Line" means any indoor line at which one (1) or more persons are waiting for or receiving service of any kind, whether or not such service involves the exchange of money.

l. "Smoking" means to inhale or exhale the smoke of burning tobacco or tobacco substitute and also to carry burning tobacco or tobacco substitute in the form of a cigarette, cigar, or any other smoke producing device including pipes.

m. "Sports Arena" means any enclosed sports pavilion, including concourses,

gymnasium, health spa, boxing arena, swimming pool, roller or ice skating rink, and other similar places. This term also applies to places where the general public assembles either to engage in physical exercise, participate in athletic or recreational activity, to witness sports, cultural, recreational or similar activities.

n. "Private social function" shall mean any weddings, parties, testimonial dinners, or other similar gatherings in which the eating arrangements are under the control of the organizer or sponsor of the event and not the person who owns manages, operates, or otherwise controls the use of the place in which the function is held.

*Section 3. Application of Article to Government Owned and/or Operated Facilities.*

All enclosed facilities owned or leased by the Niagara County and any political subdivision of the County shall be subject to the provisions of this article.

*Section 4. Regulation of Smoking in Public Places.*

a. Smoking shall be prohibited in all public places within the Niagara County, unless otherwise provided by this regulation, including but not limited to the following places:

1. Elevators.

2. Buses, taxicabs, and other means of public transit, and ticket, boarding, and waiting areas of public depots.

3. Public restrooms.

4. Service lines.

5. Retail stores.

6. All areas available to and customarily used by the general public in all businesses and non-profit entities patronized by the public, including but not limited to professional and other offices, banks, laundromats, hotels, and motels.

7. Aquariums, galleries, libraries, and museums.

8. Any facility which is primarily used for exhibiting any motion picture, stage, drama, lecture, musical recital, or other similar performance.

9. Every room, chamber, place of meeting or public assembly, including school buildings, under the control of any board, council, commission, committee, including joint committees, or agencies of the County or any political subdivision of the County.

10. Hospitals, clinics, physical therapy facilities, doctors' offices, dentists' offices and any other health facility.

11. Lobbies, hallways, and other common areas in apartment buildings, condominiums, retirement facilities, nursing homes, and other multiple unit residential and commercial facilities.

12. Polling places.

13. Places of worship.

14. Dining areas of private clubs when open to the public.

b. All Public Places are encouraged to immediately provide a smoke free environment; however, smoking may be permitted, with certain limitations as provided in various sections of this regulation including, but not limited to, Separate Smoking Rooms or in the following areas and locations:

1. Restaurants with Bars. Effective March 1, 1999, all dining areas shall be smokefree. Smoking may be allowed within Bar Areas provided the Bar Area is not the sole patron waiting area and is separated from the seated dining area by a floor to ceiling partition. A Separate Smoking Room may be provided.

2. Restaurants without Bars. Effective March 1, 1999, all dining areas shall

be smoke free. A Separate Smoking Room may be provided.

3. Bars and Taverns. Smoking may be permitted. Proper ventilation is encouraged to reduce exposure to environmental tobacco smoke.

4. Sports Arenas. Indoor facilities shall be smoke free. With concurrence of the entities that own and operate the facility, separate smoking rooms may be provided for patrons who wish to smoke.

5. Bingo Halls. A Separate Smoking Room may be provided.

6. Bowling Centers. Smoking shall be prohibited in bowling centers, except smoking may continue to be allowed in the bar area or in a Separate Smoking Room.

7. Convention Halls. Convention halls shall be smoke-free. A Separate Smoking Room may be provided.

*Section 5. Regulation of Smoking in Places of Employment.*

a. It shall be the responsibility of employers to provide a smokefree workplace for all employees, but employers are not required to incur any expense to make structural or other physical modifications.

b. Within 90 days of the effective date of this article, each employer having any enclosed place of employment located within the County shall adopt, implement, make known, and maintain a written smoking policy which shall contain the following requirements: Smoking shall be prohibited in all enclosed facilities within a place of employment without exception. This includes common work areas, auditoriums, classrooms, conference and meeting rooms, private offices, elevators, hallways, medical facilities, cafeterias, employee lounges, stairs, restrooms, vehicles occupied by more than one person, and all other enclosed facilities.

c. The smoking policy shall be communicated to all employees at least three (3) weeks prior to its adoption.

d. This section shall not prohibit smoking in Separate Smoking Rooms as defined in Section 2(j).

*Section 6 Where Smoking is Not Regulated.*

Notwithstanding any other provision of this regulation to the contrary, the following shall not be subject to the smoking restrictions contained in this regulation:

a. Private residences.

b. Private vehicles.

c. Tobacco businesses.

d. Any indoor area where private social functions are being held and when seating arrangements are under the control of the sponsor of such functions and not the owner, operator, manager or person in charge of such indoor area.

e. Hotel and motel rooms, unless otherwise regulated by management.

*Section 7. Posting of Signs.*

a. "No Smoking" signs or the international "No Smoking" symbol (consisting of a pictorial representation of a burning cigarette enclosed in a red circle with a red bar across it), shall be clearly, sufficiently, and conspicuously posted at each entrance to every building or other facility where smoking is prohibited.

b. "Smoking Permitted in Designated Areas Only" signs shall be clearly, sufficiently, and conspicuously posted at each entrance to every building or other facility where smoking is permitted.

*Section 8. Notice and Enforcement.*

a. Any owner, manager, operator, or employee of any establishment regulated by this article shall inform persons

violating the article of the appropriate provisions hereof.

b. Any citizen may register a complaint under this article to the Niagara County Health Department, Environmental Health Section.

c. The Niagara County Health Department shall be charged with enforcement of this article. The Public Health Director is authorized to issue all notices, orders and other processes that may be necessary in the enforcement of this article.

d. Upon written notice of a violation of any provision of this article, or of the rules and regulations promulgated hereunder, the Public Health Director shall cause a hearing to be held in accordance with Section 5 of Chapter I of the Niagara County Sanitary Code.

*Section 9. Violations and Penalties.*

a. It shall be a violation for any person who owns, manages, operates, or otherwise controls the use of any premises subject to regulation under this article to fail to request compliance with any of its provisions.

b. It shall be a violation for any person to smoke in any area where smoking is prohibited by the provisions of this article.

c. Any person who violates any provision of this article shall be subject to a civil penalty not to exceed one thousand dollars ($1,000.00).

*Section 10. Non-retaliation.*

No person or employer shall discharge, refuse to hire, or in any manner retaliate against any employee or applicant for employment because such employee or applicant exercises any right to a smoke free environment afforded by this article.

This article shall not be interpreted or construed to permit smoking where it is otherwise restricted by other applicable laws.

*Section 11. Severability.*

If any provision, clause, sentence, or paragraph of this article or the application thereof to any person or circumstance! shall be held invalid, such invalidity shall not affect the other provisions of this article which can be given effect without the invalid provision or application, and to this end the remaining provisions of this article are declared to be valid.

*Section 12. General Exception.*

Unless otherwise prohibited by the Public Health Law or State Sanitary Code, smoking may be permitted in a Separated Smoking Room as defined in Section 2(j). Signs must be posted as provided in Section 7(b) indicating that smoking is not permitted within the establishment, and within the designated areas only. In Restaurants with Bars and Restaurants without Bars, said Separate Smoking Room may be utilized for full service dining, but may not comprise more than thirty percent (30%) of the total seating capacity of the restaurant.

*Section 13. Interpretation.*

Nothing in this article shall be construed to create a cause of action by one person against another person for violation of any provision of this article.

*Section 14 Effective Date.*

The effective date of this regulation shall be March 1, 1999.