836 A.2d 76

Louis THEODORE, Mary Ellen Theodore and Jennifer Lynn Theodore, Individually and Louis Theodore and Mary Ellen Theodore, as the Natural Guardians of the Infant Kimberly Ann Theodore, Appellees

v.

The DELAWARE VALLEY SCHOOL DISTRICT, Appellant.

Louis Theodore, Mary Ellen Theodore and Jennifer Lynn Theodore, Individually and Louis Theodore and Mary Ellen Theodore, as the Natural Guardians of the Infant Kimberly Ann Theodore, Appellants

v.

The Delaware Valley School District, Appellee.

Supreme Court of Pennsylvania.

Resubmitted Aug. 12, 2003.

Decided Nov. 20, 2003.

Melinda B. Kaufmann, Stephen S. Russell, New Cumberland, for Delaware Valley School Dist.

Vern Scott Lazaroff, Robert N. Isseks, Pro Hac Vice, Alex Smith, Pro Hac Vice, for Louis Theodore, et al.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION OF THE COURT

Justice CASTILLE.

In 1998, the Delaware Valley School District (the "School District" or "District") adopted a policy which authorizes random, suspicionless drug and alcohol testing of students who hold school parking permits or participate in voluntary extracurricular activities. Appellees Louis and Mary Ellen Theodore, whose two daughters were subject to the policy, filed a complaint seeking to enjoin the testing policy on grounds that, *inter alia,* it violated their daughters' right to privacy under

Article I, Section 8 of the Pennsylvania Constitution. The primary question in this appeal is whether, for purposes of the preliminary objections subsequently filed by the School District, the policy must be deemed constitutional as a matter of law. Because we reject the District's argument that the policy is constitutional as a matter of law, we affirm the decision of the Commonwealth Court which reinstated the complaint and permitted the case to go forward.

On May 14, 1998, the District, which is located in Pike County, adopted Policy 227, made effective July 1, 1998, which required all middle and high school students seeking to participate in extracurricular activities or requesting permission to drive to school or park at school to sign, or have a parent sign,[1] a "contract" consenting to testing for alcohol and controlled substances.[2] The policy defines extracurricular activities as all athletics, clubs, and other activities in which students participate on a voluntary basis, and for which academic credit is not awarded. The policy includes the following statement of purpose:

As representatives of the school district and leaders in their schools, students involved in extracurricular programs and students who drive to school are expected to exemplify high standards by the public and are held in high esteem by other students. Participants in extracurricular programs and those who drive to school are expected to accept the responsibilities accompanying these opportunities.

Deterring drug use by school students is important. School years are the time when the physical, psychological, and addictive effects of drugs are most severe. The effects of a drug-infested school are visited not just upon the users, but

1. A parent signs the contract unless the student is married or over 18 years of age.

2. Policy 227 was implemented pursuant to Section 510 of Article V of the Pennsylvania School Code of 1949, Act of March 10, 1949, P.L. 30 (as amended, 24 P.S. § 5–510), which authorizes school boards to adopt reasonable rules and regulations concerning the management of school affairs and the "conduct and deportment of all pupils" while under the school's supervision. The District's statutory authority to adopt such a policy has not been challenged.

upon the entire student body and faculty, because the educational process is disrupted.

With regard to school athletes and student drivers, the risk of immediate physical harm to the drug and alcohol user or those with whom he/she is playing a sport or sharing the highway is particularly high. Apart from psychological effects, which include impairment of judgment, slowing of reaction time, and a lessening of the perception of pain, alcohol and the particular drugs screened by this policy pose substantial physical risks to athletes and drivers. Extracurricular participants, whether athletes or not, are student leaders and, as such, serve as role models for their peers and for young children as well. The use of drugs and alcohol by these role models exacerbates the problem of illegal substances in our schools.

Nothing in this statement of purpose, or in any other pleading of record, suggests that the class of students targeted for random testing were the source of an existing, active drug problem in the District. Moreover, at least at this stage of the proceeding, it appears that certain students (*i.e.*, non-athlete, non-driving extracurricular participants deemed, by that status, to be "student leaders") were targeted for symbolic reasons, since they were deemed to be "role models."

The signed contract is effective for one year and authorizes school officials to collect breath, urine and blood samples from the student. The samples cannot be used to test for any medical condition other than the presence of a specific list of intoxicants. Students may not refuse to submit to a test without penalty, for any such refusal (or any alteration of a test sample) is considered the equivalent of a positive test result. Policy 227 defines a positive test result as one that reflects either a blood alcohol content (BAC) level of at least .02 percent or the presence of any level of a controlled substance. The School District bears all costs associated with the testing.

Testing is required in five different circumstances: initial testing, random testing, reasonable suspicion testing, return-to-activity testing, and follow-up testing. Students must sub-

mit to testing initially when they register for an extracurricular activity or apply for a parking permit.[3] The School District randomly tests five percent of the targeted students on a monthly basis. Random testing is unannounced and occurs throughout the school year. The selection of students for random testing is accomplished "by a scientifically valid method," and each student has an equal chance of being selected with each random sampling. When the sponsor of an extracurricular activity or another authorized adult has reasonable individualized suspicion that an extracurricular student or student with parking privileges has used alcohol or an enumerated controlled substance, the District conducts reasonable suspicion-based testing. Before a student who tests positive for any banned substance may resume extracurricular activity or parking privileges, he or she must undergo return-to-activity testing. Follow-up testing, which proceeds unannounced, is implicated when a covered student needs assistance in resolving problems associated with drug or alcohol use as determined by a substance abuse professional.

Under Policy 227, if a breath, urine, or blood test reveals the presence of alcohol or drugs, and the positive result is confirmed, a medical review officer conducts an investigation—which may include an interview with the student and a review of the student's medical history or "other biomedical factors"—to determine whether there is an alternative explanation for the result. The student and the student's parents are provided an opportunity to address a positive result. If no alternative explanation exists, the positive result is reported to the school's athletic director and principal. Within three days of that report, the student or parents may request a retest of the sample.

If no retest is requested, or if the retest confirms the presence of intoxicants, the positive result is disclosed to school personnel deemed to have a "need to know," which

3. It appears from the policy that a student may hold a parking permit only if he or she has permission to drive to school, and *vice versa.* Accordingly, this opinion shall not refer to school driving privileges as separate from parking privileges.

includes the guidance counselor, the student's coach and/or advisor, the designated substance abuse professional, and the "Student Assistance Team." [4] These school representatives are required to protect the confidentiality of the test results. Additionally, the policy contemplates that the principal (or designee) will hold a parent conference to discuss the test result, and the student must participate in a drug/alcohol assessment with a certified evaluator. A student who tests positive for the first time must also participate in a drug assistance program, must submit to weekly testing for six weeks, and is suspended from athletics, club events, and performances and/or parking privileges for a period of time. The suspension extends to one calendar year upon a second positive test, and to all remaining school years upon a third. The fact of a positive test is not disclosed to law enforcement or juvenile authorities (unless under legal compulsion such as a subpoena), nor does it constitute grounds for suspension or expulsion from school or otherwise affect the student's academic standing.

Jennifer Lynn Theodore and Kimberly Ann Theodore ("the students") were subject to mandatory urinalysis testing under Policy 227 because Jennifer participated in the National Honor Society, Science Olympiad, and Scholastic Bowl, while Kimberly participated in tennis, swimming, and track, and had a parking permit. Both girls were required to provide urine samples: Kimberly on August 27, 1998, and Jennifer on or about November 4, 1998. Both tests returned negative for any banned substance. In January, 1999, the students' parents, Louis and Mary Ellen Theodore (appellees), filed suit in the Court of Common Pleas of Pike County, both individually and as their daughters' natural guardians, seeking to enjoin the School District from continuing to test students. In their amended complaint, appellees contended that their daughters had been forced to submit urine samples against their wills and asserted that Policy 227 deprives students of their right to be free from unreasonable searches and seizures as guaran-

4. The policy does not specify the composition of the Student Assistance Team.

teed by Article I, Section 8 of the Pennsylvania Constitution.[5] Appellees also alleged that the policy violated their parental rights because test results are disclosed to others and the mandatory counseling contemplated by the policy, upon a test returning positive, invades their fundamental right to make decisions involving their children's health care.

The School District filed preliminary objections in the nature of a demurrer, claiming (1) that appellees lacked standing in their individual capacities; and (2) that the complaint did not state a case ripe for adjudication because the students had not been subjected to any disciplinary action, counseling, or drug and alcohol intervention under the policy. In its accompanying brief, the District included a brief argument under the ripeness objection, apparently responding to the merits of appellees' Article I, Section 8 claim and asserting therein that the Commonwealth and the District have a compelling interest to see that public school students not use drugs and that this interest outweighed the privacy rights of the students and appellees.

Appellees filed a response to the preliminary objections. With respect to the Article I, Section 8 question, appellees argued, *inter alia*, that resolution of the claim on the merits would depend upon whether the District could make a particularized showing of a special need for random, suspicionless testing of the targeted students. Appellees noted that the District had not even attempted to justify its program by proving the existence of an actual drug crisis in the District, much less within the targeted class of students. Appellees argued that, at a minimum, the issue of special need could not be resolved absent discovery and, accordingly, the District's preliminary objections were premature. Appellees argued in the alternative that, under the heightened protections of Article I, Section 8, even a showing of special need should not be

---

**5.** This provision states that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant." PA CONST art. I, § 8.

viewed as justifying the sort of random, suspicionless searches conducted under Policy 227.

In a reply brief, the District responded to the argument that it was obliged to prove an actual, existing drug problem among the targeted students by arguing that the federal courts had established no such requirement under the Fourth Amendment, but instead would permit school districts to rely upon the generally-recognized, "overall drug problem in schools" to justify random, suspicionless testing of select groups of students. The District also adverted to recent "publicity surrounding the drug problem in Delaware Valley." In support of that assertion, the District attached and cited to a February 24, 1998 local newspaper article reporting a single arrest of a student at Delaware Valley High School for delivering a $3 packet of heroin to another student at the school. According to the article, the Westfall Township Police Chief had "confirmed ... that the arrest was the first ever involving heroin at the 1,150 student high school," but that the school "averages three or four drug-related arrests each school year, usually for marijuana." The article did not address whether either of the students involved in the heroin sale was involved in extracurricular activities or had parking privileges.

On July 21, 1999, the trial court granted the School District's preliminary objections and dismissed appellees' complaint. The trial court concluded that Policy 227 was constitutional as a matter of law. The court recognized that the then-leading federal case on suspicionless drug testing in public schools was *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). The court examined the balancing test set forth in *Vernonia* and the cases interpreting it and concluded that Policy 227 survived Fourth Amendment scrutiny on its face because: (1) students had a reduced expectation of privacy when engaged in voluntary school activities; (2) the authorized intrusions were minimal; (3) students had notice of the policy; and (4) the School District had an important interest in protecting the health and well-being of the pupils under its care. Turning to appellees'

actual claim sounding under Article I, Section 8, the court analyzed this Court's decisions in *In Re F.B.*, 555 Pa. 661, 726 A.2d 361 (1999), *cert. denied*, 528 U.S. 1060, 120 S.Ct. 613, 145 L.Ed.2d 508 (1999) and *Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350 (1998) (opinion announcing judgment of court), *cert. denied*, 525 U.S. 833, 119 S.Ct. 89, 142 L.Ed.2d 70 (1998), and recognized that, though "slightly different" from the approach outlined in *Vernonia*, the Pennsylvania constitutional approach suggested in *Cass* and *F.B.* nevertheless contained "a great deal of similarity." Concluding that "comparable intrusion[s]" upon student privacy in *Cass* and *F.B.* had been upheld, the court held that appellees' Pennsylvania constitutional challenge failed as a matter of law. The trial court also rejected appellees' claim that the District was required to establish a special need to test this targeted group of students. Finally, the court rejected appellees' parental rights claim.

The Commonwealth Court, sitting *en banc*, affirmed the dismissal of appellees' parental rights claims, but vacated and remanded on the claim brought on behalf of the students, reinstating the complaint as to that claim. *Theodore v. Delaware Valley School District*, 761 A.2d 652, 661 (Pa.Cmwlth. 2000) (*en banc*). Writing for a three-judge plurality, Judge Pellegrini reasoned that the approach in *Vernonia* was consistent with this Court's approach to school search questions, particularly as articulated in *In re F.B.* The plurality reasoned that, when a search is targeted at a specific group of students rather than at all students (as was the case in *In re F.B.*), some specific reason must be articulated why that group alone is being tested. 761 A.2d at 659. Applying the multi-factor balancing test it derived from *In re F.B.*, the plurality reasoned that, although the privacy interests of public school students were less weighty than the comparable interests of adults, the privacy interests of the targeted students could not be deemed less weighty than the privacy interests of other students. The plurality considered the nature of the intrusion here to be minimal and also accepted that the stated purpose of the intrusion (to protect the health and safety of students generally) might support a generalized testing program. The

plurality deemed Policy 227 to be unreasonable under Article I, Section 8, however, because there was no reason articulated by the District evidencing a special need which supported its decision to target these selected students: "the School District promulgated its sweeping policy to conduct selective searches without articulating a single reason why the specific group it chose required testing over that of the general school population." *Id.* at 661. The plurality then proceeded to address briefly appellees' parental rights claims, finding that the policy did not violate those rights. *Id.* at 661–62.

In a concurring opinion, Judge Friedman agreed with the reinstatement of the students' claim and agreed that *In re F.B.* provided the controlling analytical framework. Judge Friedman wrote separately because her application of that authority differed from the plurality's. Judge Friedman did not view the intrusions authorized by Policy 227 as minimal. In addition, Judge Friedman believed that the policy did not provide sufficient notice of what criteria must be present before a search is performed and the manner in which the search is conducted, and questioned the proposition that students could be deemed to be subjecting themselves to the tests voluntarily, since extracurricular activities play such an integral role in the life of the modern student. The concurrence agreed with the plurality on the key point that the District had failed to demonstrate any special need to search only those pupils involved in extracurricular activities or seeking parking privileges. Because the students might prevail on that claim, Judge Friedman concurred in its reinstatement. Finally, Judge Friedman agreed that appellees' parental claims were properly dismissed as their daughters' tests were negative; hence, any controversy relating to parental rights was unripe. *Id.* at 662–67 (Friedman, J., concurring).

In a dissenting opinion joined by then-President Judge Doyle and Judge McGinley, Judge Leadbetter opined that, although she agreed "with virtually all of the analysis" of the plurality, the District had articulated a sufficient governmental interest to justify the intrusion, and hence, the trial court's order should be affirmed as to the students' claim. The

dissent did not address the parental rights' claim. *Id.* at 667 (Leadbetter, J., dissenting).

The parties cross-petitioned for allocatur. After granting both petitions, *see Theodore v. Delaware Valley School District*, 566 Pa. 673, 782 A.2d 551 (2001), we delayed consideration of the consolidated appeal pending the United States Supreme Court's disposition of *Board of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). The 5–4 decision in *Earls* ultimately upheld against a Fourth Amendment challenge an Oklahoma school district's policy requiring all middle and high school students who would participate in extracurricular activities to consent to random, suspicionless drug testing. After *Earls* was decided, we requested supplemental briefing and heard argument. The case is now ready for decision.

 We begin by emphasizing the procedural posture of the case. The matter comes to us as a question of whether the trial court properly sustained preliminary objections in the nature of a demurrer. In reviewing such objections, all material facts properly pleaded in the complaint, as well as all inferences reasonably deducible from those facts, are deemed admitted. *E.g., Kohler v. McCrory Stores*, 532 Pa. 130, 615 A.2d 27, 30 (1992) (citation omitted). The demurrer may be granted only where, upon application of this standard, it is apparent that the plaintiff is not entitled to relief as a matter of law. *Small v. Horn*, 554 Pa. 600, 722 A.2d 664, 668 (1998) (citing *Lampus v. Lampus*, 541 Pa. 67, 660 A.2d 1308 (1995)). Any doubt as to whether demurrer is appropriate should be resolved in favor of overruling the demurrer. *Kohler.*

 Turning first to the District's claim concerning reinstatement of the students' complaint, the demurrer was sustained by the trial court based upon its conclusion that the policy was constitutional as a matter of law. The Commonwealth Court deemed the policy to be constitutionally infirm. The question of the constitutionality of Policy 227, like the question of whether demurrer is appropriate, is one of law; therefore, our review is plenary. *Purple Orchid v. Pennsylva-*

*nia State Police,* 572 Pa. 171, 813 A.2d 801 (2002) (citing *Pennsylvania School Boards Assoc., Inc. v. Commonwealth Association of School Administrators,* 569 Pa. 436, 805 A.2d 476, 479 (2002); *Phillips v. A–Best Products Co.,* 542 Pa. 124, 665 A.2d 1167 (1995)).

The District contends that Policy 227 is virtually identical to the policy at issue in *Earls.* The District argues that Article I, Section 8 should not be construed as imposing greater limitations upon the authority of public schools to conduct student drug tests beyond those imposed by the Fourth Amendment, as all public schools possess an inherent "special need" to drug test the pupils under their care.

Appellees respond that Article I, Section 8 provides students with greater protection than the Fourth Amendment in this instance, consistently with the viewpoint articulated in the *Earls* dissent. Appellees emphasize that there is a high expectation of privacy in one's excretory functions and that extracurricular activities "serve the 'modest and shy along with the bold and uninhibited.'" Appellees' Supplemental Brief at 2 (quoting *Earls,* 536 U.S. at 847, 122 S.Ct. at 2574 (Ginsburg, J., dissenting)). Activities such as the National Honor Society and Science Olympiad should therefore be distinguished from voluntary school athletics in which privacy expectations are lowered by communal undress, physical contact, and mandatory pre-season physical exams. Appellees also assert that drug testing extracurricular participants is "perverse" in that it targets the group of students least likely to be at risk from illicit drugs. They contend further that participation in extracurricular activities cannot be considered voluntary in the ordinary sense, as it is an integral component of school life, "'essential in reality for students applying to college, and, for all participants, a significant contributor to the breadth and quality of the educational experience.'" Supplemental Brief at 7 (quoting *Earls,* 536 U.S. at 845, 122 S.Ct. at 2573 (Ginsburg, J., dissenting)).

Although the question before this Court involves Pennsylvania's search and seizure provision, some discussion

of the U.S. Supreme Court's pertinent school search decisions is useful as background and to understand the basis of our distinct approach under Article I, Section 8. To be deemed reasonable under the Fourth Amendment, a search must ordinarily be based upon probable cause to believe that a violation of the law has occurred. *See New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). The Court has recognized that a search unsupported by probable cause may be permissible, however, where "special needs" beyond those associated with law enforcement make this requirement impractical. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 677, 109 S.Ct. 1384, 1397, 103 L.Ed.2d 685 (1989) (upholding suspicionless drug-testing of customs officials carrying firearms or involved in drug interdiction activities); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 633–34, 109 S.Ct. 1402, 1422, 103 L.Ed.2d 639 (1989) (upholding federal regulations requiring suspicionless drug testing of private railway employees).[6]

■■ The Fourth Amendment protects public school students from unreasonable searches and seizures by school officials. *T.L.O.*, 469 U.S. at 333, 105 S.Ct. at 738. *See generally Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) (students do not "shed their constitutional rights ... at the schoolhouse gate"). However, the public school setting is an area where the U.S. Supreme Court has determined that "special needs" exist, due to the school's custodial and tutelary responsibilities to its students, as well as its need for flexibility and informality in devising disciplinary structures to maintain an environment conducive to learning. *Vernonia*, 515 U.S. at 653, 115 S.Ct. at 2391. Thus, the Court has held that school officials may search individual students based upon less than probable cause, so long as the search is "reasonable." *See*

---

**6.** State-compelled toxicological (blood, breath or urine) testing is a search for purposes of the Fourth Amendment, *Skinner*, 489 U.S. at 617, 109 S.Ct. at 1413, as well as Article I, Section 8. *Commonwealth v. Kohl*, 532 Pa. 152, 615 A.2d 308, 315 (1992). *See generally Skinner* (chemical analysis of blood or urine "can reveal a host of private medical facts").

*T.L.O.,* 469 U.S. at 340, 105 S.Ct. at 742. Reasonableness is measured by "balancing the need to search against the invasion which the search entails." *Id.* at 337, 105 S.Ct. at 740 (internal quotation marks omitted).

The state action deemed reasonable in *T.L.O.* was a search of a student's purse based upon individualized suspicion. Individualized suspicion, of course, has long been a central tenet of Fourth Amendment jurisprudence. *See Terry v. Ohio,* 392 U.S. 1, 21 & n. 18, 88 S.Ct. 1868, 1880 & n. 18, 20 L.Ed.2d 889 (1968). In *Vernonia,* however, the Court recognized that the special needs attending the public school setting might also justify suspicionless searches of individuals in some circumstances. *Vernonia* involved a drug-testing program which targeted students engaged in voluntary interscholastic athletics. The program was targeted at these student-athletes because they were a major source of a documented and active drug problem in the district. Teachers and administrators in the district had detected a sharp increase in drug use, a glamorization of drug use, and a concomitant increase in classroom disruption and suspensions. Student-athletes not only were among the drug-users, but they "were the leaders of the drug culture." In addition, the district had undertaken less intrusive responses to this drug crisis, which had failed to a point where, as the federal District Court stated, the "administration was at its wits end." 515 U.S. at 648–49, 115 S.Ct. at 2388–89 (citation omitted).

In analyzing the *Vernonia* drug-testing policy, the Court first held that the Fourth Amendment does not contain an "irreducible requirement" of individualized suspicion. *Id.* at 653, 115 S.Ct. at 2391 (citing, *inter alia, United States v. Martinez–Fuerte,* 428 U.S. 543, 560–61, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976)). The Court then applied a balancing test whose purpose was to determine the reasonableness of suspicionless searches, weighing three basic factors: (1) the nature of the privacy interest at issue; (2) the character of the intrusion; and (3) the nature and immediacy of the governmental concern and the efficacy of the means employed to address that concern. In ultimately approving the drug-

testing policy, the Court emphasized that: public school students have a lower expectation of privacy than citizens generally; student-athletes' expectations of privacy are necessarily lower still, given pre-season physical examinations and the communal undress inherent in the locker rooms; the search was relatively unobtrusive; the district had a demonstrated need to address the well-documented drug crisis extant in the school; the district had an interest in deterring drug use among students generally and student athletes in particular, because of the increased risk of physical injury attendant upon the mixture of drugs and athletics; the governmental concern was important and immediate; and this program was an efficacious way to address the demonstrated problem because it was aimed directly at the student-athletes who were a major part of that problem. In addition, the Court emphasized that the districtwide program had been the subject of a public meeting and the program generated no objection with the exception of the lawsuit at issue.

The Court significantly extended *Vernonia*'s holding in *Earls* by approving a random, suspicionless drug-testing policy which was neither a response to, nor targeted toward, a specific group of problematic students. The policy in *Earls* was similar to the one at issue here, *i.e.*, it required all middle and high school students to consent to random urinalysis drug testing in order to participate in any extracurricular activity.[7] The federal District Court upheld the policy, indicating that, although the school district "did 'not show a drug problem of epidemic proportions,' there was a history of drug abuse starting in 1970 that presented 'legitimate cause for concern.' " *Id.* at 827, 122 S.Ct. at 2563 (quoting *Earls v. Board of Educ. of Tecumseh Pub. Sch. Dist.*, 115 F.Supp.2d 1281, 1287 (W.D.Okla.2000)). The Court of Appeals reversed, stating that the school district had failed to demonstrate the existence of an "identifiable drug abuse problem among a sufficient number of those subject to the testing, such that testing that

7. The Court listed as examples: the Academic Team, Future Farmers of America, Future Homemakers of America, band, choir, cheerleading, and athletics. *Earls*, 536 U.S. at 826, 122 S.Ct. at 2562–63.

group of students will actually redress its drug problem." *Id.* at 828, 122 S.Ct. at 2563 (quoting *Earls v. Board of Educ. of Tecumseh Pub. Sch. Dist.*, 242 F.3d 1264, 1278 (10th Cir. 2001)).

In reversing the 10th Circuit, the U.S. Supreme Court, in an opinion by Justice Clarence Thomas, observed initially that, because there is a "special need" in the school environment to uncover or prevent drug usage, individualized suspicion is not a prerequisite to a valid search. Rather, the Court deemed it appropriate under the three-factor *Vernonia* test simply to weigh the intrusion upon the children's Fourth Amendment rights against the promotion of a legitimate governmental interest. *Earls*, 536 U.S. at 830, 122 S.Ct. at 2565. Concerning the students' privacy interests, the Court perceived no controlling distinction between athletic and non-athletic activities, thus concluding that all participants in extracurricular activities had a diminished expectation of privacy. *See id.* at 831–32, 122 S.Ct. at 2565–66. As for the second *Vernonia* factor, the Court recognized that the intrusion upon privacy was twofold: the intrusion created by the collection of urine samples, and that resulting from disclosure of the test results. The Court dismissed the first component of the intrusion as trivial, noting that the collection method was essentially the same as that in *Vernonia*. *Id.* at 833, 122 S.Ct. at 2566. As to the second component, the Court noted that the test results are only released to those with a "need to know," are used only to regulate participation in school activities, and are not forwarded to law enforcement authorities, which rendered "the invasion of the students' privacy . . . not significant." *Id.* at 834, 122 S.Ct. at 2567. Turning to the final *Vernonia* factor, the Court apparently removed any inquiry into the actual efficacy of the program from the Fourth Amendment analysis employed in *Vernonia*, instead stating categorically that testing extracurricular participants is an effective means of achieving the goal of deterring student drug use generally. *Id.* at 837–38, 122 S.Ct. at 2569. The Court weighed the minor intrusion upon the students' privacy rights it perceived against the interest to be promoted and found that the govern-

mental interest prevailed, and thus, rejected the Fourth Amendment challenge. *See id.* at 835–37, 122 S.Ct. at 2567–69.

Justice Stephen Breyer, who also joined the majority, filed a concurring opinion which emphasized that the drug problem in the nation's schools is serious, and that governmental supply-side interdiction efforts have not reduced teenage drug use in recent years. Justice Breyer noted his approval of the school district's attempt to reduce the demand for drugs by targeting peer pressure, which he termed the "single most important factor leading school children to take drugs," observing that the policy "offers the adolescent a nonthreatening reason to decline his friend's drug-use invitations," *i.e.*, by explaining that he wants to participate in school athletics or extracurricular activities. *Earls,* 536 U.S. at 840–41, 122 S.Ct. at 2570 (Breyer, J., concurring). Additionally, Justice Breyer acknowledged that while some would disagree that the intrusion on privacy inherent in producing a urine sample is "negligible," he deemed it important that, in resolving "this kind of close question involving the interpretation of constitutional values," the school board had "provided an opportunity for the airing of these differences at public meetings designed to give the entire community the opportunity to be able to participate in developing the drug policy." He further noted that that "democratic, participatory process to uncover and to resolve differences" had "revealed little if any objection to the proposed testing program." *Id.* at 841, 122 S.Ct. at 2570–71 (internal quotations omitted).

Justice Ruth Bader Ginsburg, joined by Justices John Paul Stevens, Sandra Day O'Connor, and David H. Souter, dissented. The Dissent noted that the majority's reasoning was at odds with *Vernonia,* in which the Court had relied heavily upon the policy's targeting the very students responsible for promoting the drug culture the district sought to eradicate: "The *Vernonia* Court concluded that a public school district facing a disruptive and explosive drug abuse problem sparked by members of its athletic teams had 'special needs' that justified suspicionless testing of district athletes as a condition

of their athletic participation." *Id.* at 844, 122 S.Ct. at 2572 (Ginsburg, J., dissenting). Applying *Vernonia,* the Dissent asserted that *Earls* involved circumstances that were "dispositively different." To the extent the Majority had grounded its disposition upon the prevalence of teenage drug use generally, combined with the diminished privacy expectations of school-children generally, the Dissent noted that these factors apply to all students, not just those involved in extracurricular activities. By singling out extracurricular participants, the school district's purpose was merely "to heighten awareness of its abhorrence of, and strong stand against, drug abuse." *Id.* at 854, 122 S.Ct. at 2578. As communication of such a message serves mere symbolic ends, the Dissent opined that it could not overcome the Fourth Amendment rights of school-children. *See id.* (citing *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (invalidating Georgia statute requiring all candidates for high office to submit to drug test, as underlying governmental need was "symbolic," not "special")). The Dissent concluded as follows:

> It is a sad irony that the petitioning School District seeks to justify its edict here by trumpeting the schools' custodial and tutelary responsibility for children. *Vernonia,* 515 U.S., at 656, 115 S.Ct. 2386, [2392,] 132 L.Ed.2d 564. In regulating an athletic program or endeavoring to combat an exploding drug epidemic, a school's custodial obligations may permit searches that would otherwise unacceptably abridge students' rights. When custodial duties are not ascendant, however, schools' tutelary obligations to their students require them to teach by example by avoiding symbolic measures that diminish constitutional protections. That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes. *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, [1185,] 87 L.Ed. 1628 (1943).

*Id.* at 855, 122 S.Ct. at 2578.[8]

We have little doubt that, if this case presented a Fourth Amendment challenge, the intervening decision in *Earls* would require us to reverse the Commonwealth Court. Although there are references in the *Earls* litigation to record evidence of drug use at the schools involved, a close reading of Justice Thomas's opinion suggests that the Court would have upheld the policy regardless. For example, the Court stated that, in other contexts, it had upheld random drug testing programs without any documented history of drug use, 536 U.S. at 835, 122 S.Ct. at 2568 (citing *Von Raab*, 489 U.S. at 673, 109 S.Ct. at 1384); student drug abuse is a "pressing concern" at every school in the nation, *id.* at 834, 122 S.Ct. at 2567; schools are permitted to take proactive measures to deter or prevent such drug use, *see id.* at 836, 122 S.Ct. at 2568; and it would be impossible to articulate a threshold level of drug use sufficient to justify a drug testing program in any event. *See id.*

■ The Article I, Section 8 question, however, is more difficult. "The cases decided under Article I, [Section] 8, have recognized a 'strong notion of privacy, which is greater than that of the Fourth Amendment.' " *Commonwealth v. Glass*, 562 Pa. 187, 754 A.2d 655, 662 (2000) (quoting *Commonwealth v. Waltson*, 555 Pa. 223, 724 A.2d 289, 292 (1998)). *See also Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887, 899 (1991) (twin aims of Article I, Section 8 are safeguarding of privacy and warrant requirement). Thus, as we held in *In re F.B.*, "the unique policy concerns safeguarding the individual right to privacy in Pennsylvania bring a greater degree of scrutiny to all searches where the protection of Article I, Section 8 is invoked." 726 A.2d at 365. Moreover, we also specifically held that Article I, Section 8 "mandate[s] greater scrutiny in the school environment." *Id.*

■ The *In re F.B.* Court concluded that the appropriate state constitutional test in the school environment involves

---

**8.** Justice O'Connor, joined by Justice Souter, also filed a brief, separate dissenting opinion, noting that she had dissented in *Vernonia* and continued to believe that that case was wrongly decided. *Id.* at 842, 122 S.Ct. at 2571 (O'Connor, J., dissenting).

balancing four factors: (1) the students' privacy interests, (2) the nature of the intrusion created by the search, (3) notice, and (4) "the overall purpose to be achieved by the search and the immediate reasons prompting the decision to conduct the actual search." 726 A.2d at 365. The Court looked for guidance to *Vernonia*, and noted that the test it ultimately fashioned bore a "great similarity" to the *Vernonia* test, *id.* at 365—albeit the notice prong lacks a counterpart in *Vernonia*. We recognize that the fourth prong of the *In re F.B.* test is stated somewhat differently than its *Vernonia* counterpart. *Vernonia* expressed this concern in terms of the "nature and immediacy" of the governmental interest and the "efficacy" of its chosen means in advancing that interest, *see* 515 U.S. at 660, 115 S.Ct. at 2394, while *In re F.B.* spoke in terms of the government's "overall purpose" and "immediate reasons" for conducting the search. 726 A.2d at 365. But, the analytical point is the same: the reasonableness of a search will depend in part upon a measure of the reason and purpose for the search and the government's chosen means of effecting it. This consideration is appropriate, for if the method is not efficacious, then the government's need to conduct the intrusion is correspondingly diminished.

▮▮▮ *In re F.B.* involved a suspicionless search of the entire student body for weapons, but there is no reason why the school search test formulated there should not also apply to searches which target a defined subset of the student population for after-the-fact evidence of drug or alcohol use. In addition, the fact that the U.S. Supreme Court relaxed its scrutiny in this area since we last visited the question, *see Earls,* is no reason for this Court to reconsider the *Vernonia*-based test we formulated in *In re F.B.* This is so not only because of the heightened right to privacy existing under Article I, Section 8, but also because of sound state jurisprudential concerns. The necessity of maintaining a cogent, consistent, and knowable state constitutional approach is particularly pressing where the corresponding federal law has been changeable or uncertain. As we recently noted in *Pap's A.M. v. City of Erie,* 571 Pa. 375, 812 A.2d 591 (2002):

As a matter of policy, Pennsylvania citizens should not have the contours of their fundamental rights under our charter rendered uncertain, unknowable, or changeable, while the U.S. Supreme Court struggles to articulate a standard to govern a similar federal question. There is an entirely different jurisprudential and constitutional imperative at work when this Court, which is the final word on the meaning of our own charter in a properly joined case or controversy, is charged with the duty to render a judgment. 812 A.2d at 611. In *In re F.B.*, this Court adopted an approach based upon *Vernonia;* we did not adopt the very different, hands-off approach later articulated in *Earls. See Earls,* 536 U.S. at 845, 122 S.Ct. at 2573 (Ginsburg, J., dissenting) ("Had the *Vernonia* Court agreed that public school attendance, in and of itself, permitted the State to test each student's blood or urine for drugs, the opinion in *Vernonia* could have saved many words."). Accordingly, the test articulated in *In re F.B.* controls our query under Article I, Section 8.

*In re F.B.* considered a search of all students entering a public high school for weapons. All students were required to pass through a stationary metal detector with the potential for a follow-up scan of their bodies with a hand-held metal detector. In addition, the students' book bags, purses and coats were physically inspected, and each student was required to empty his or her pockets for examination. Looking to the students' privacy interest, we found that "the search of a person always involves a greater degree of intrusion upon one's privacy interest than the search of a thing." *Id.* (citing *Commonwealth v. Martin,* 534 Pa. 136, 626 A.2d 556 (1993)). Turning to the nature of the intrusion, we found the intrusion to be minimal given that the search was non-invasive; indeed, it was no different from the intrusion experienced by air travelers and those seeking to enter government buildings, where metal detectors, hand-held scanners and x-ray machines are routinely employed. The third factor, notice, weighed in favor of upholding the search, because the school's policy manual contained information regarding point-of-entry weap-

ons searches and notices were routinely mailed to students' homes and were posted prominently in the school building. As to the fourth factor, this Court noted that the need to ban weapons entirely from the school environment is "obvious" and there was no "logical argument" in opposition to such a policy. This was so much so that we held that the absence of a record concerning the purpose or immediate reasons for the challenged search was not fatal to its validity. As the reasons supporting the search comported with the school's core duty to keep students safe, the school was "not required to wait for a tragedy to occur within [its] walls to demonstrate that the need is immediate." 726 A.2d at 366–67.

Also instructive in this area is this Court's earlier plurality decision in *Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350 (1998) (Opinion Announcing Judgment of Court by Cappy, J.). There, we approved of a general and suspicionless search of all student lockers for evidence of drug use. Key factors present in *Cass* included that: there was evidence of a specific and increasing drug problem in the school to which officials were responding; it was reasonable for those officials to believe that evidence of drug use could be found in some student lockers; the general "search" consisted of a trained canine sniffing the lockers; a canine search of the outside of a school-owned locker is not intrusive; all lockers were subject to the canine sniff, not just a select few; students were forewarned of the possibility of locker searches; the students had only a limited expectation of privacy in the school-owned lockers; and searches of the interior of the lockers occurred only if there was particularized suspicion, *i.e.*, the canine alerted to drugs at the locker. 709 A.2d at 361–62.

With the teaching of *Cass*; *In re F.B.*, and *Vernonia* in mind, we have no doubt that Policy 227 cannot survive an Article I, Section 8 challenge on its face, so as to presently entitle the District to a demurrer. First, since the students' privacy rights here—rights which were rather summarily dismissed by *Earls*—have greater meaning under Article I, Section 8, the testing authorized by the District cannot be viewed as a trivial incursion on privacy. While students'

privacy expectations are lessened by virtue of their presence at school, students may reasonably anticipate that the privacy associated with their excretory functions will be diminished at school only modestly via the need to use public restrooms. We also agree with Justice Breyer that many students could reasonably consider production of a urine sample for testing to involve a greater imposition than the ordinary use of a public restroom. *See Earls*, 536 U.S. at 841, 122 S.Ct. at 2571 (Breyer, J., concurring); *cf. Skinner*, 489 U.S. at 617, 109 S.Ct. at 1413 ("There are few activities in our society more personal or private than the passing of urine[;] . . . [i]t is a function traditionally performed without public observation[.]" (internal quotation marks omitted)) Thus, it is significant that the District here has elected not merely to conduct searches of student lockers, clothing, or personal belongings, as in *Cass* and *In re F.B.*, but seeks bodily fluids as well as an ensuing chemical analysis of the sample obtained.

We recognize, however, that the intrusion is ameliorated somewhat by the fact that the policy states that all tests will be "conducted according to established protocol," and that "[u]rine or blood samples shall be collected by trained medical personnel in a manner that balances the values of privacy and confidentiality with the accuracy of the tests." Other aspects of the policy also help to ensure that there is no arbitrary or oppressive action beyond the fact of the search itself: *i.e.*, students are chosen at random for testing; the procedures are not designed to lead to criminal or disciplinary actions; and the results are provided to a limited set of defined school officials.

Turning to the third factor, although the timing of the tests were deliberately made unknowable to the students, the District provided general notice by providing copies of the policy and requiring signatures of parents and students on a contract prior to the students' involvement in any extracurricular activity or obtaining a parking permit.

We are left then with a final consideration of the reasons the District enacted the policy and the efficacy and reasonableness of the policy in furthering the purpose identified.

Any analysis of efficacy obviously must include an inquiry into the reasonableness of selecting only the targeted students for testing.

In forwarding its preliminary objection here, the District did not suggest that there is a specialized need to test for drugs and alcohol because of an existing drug or alcohol problem in the District, much less a problem that is particular to the targeted students. Moreover, the statement of purpose accompanying the policy recites nothing specific to the District, or the targeted students, but instead relies upon the importance of generally deterring drug use among students. The statement of purpose does note that there is some safety-based reason to single out athletes and student drivers, since drug or alcohol impairment when engaged in such activities may "risk ... immediate physical harm." As to other extra-curricular participants, however, the only explanation given is that those participants, like athletes and drivers, are "student leaders and, as such, serve as role models for their peers." These students, it appears, have been selected for testing for symbolic purposes—*i.e.*, their privacy rights are deemed forfeit so as to set an example for other students.

The compelling need to combat and deter drug use among students is obvious, and the District's desire to take action in that regard is certainly understandable, particularly in light of the school's duty to maintain a safe, appropriate environment for learning. The tragic fact that there is a continuing drug problem among certain youth in America certainly justifies some responsive measures in public schools. *See Cass*, 709 A.2d at 364 ("This court would be remiss in its duty if it were to ignore the very real dangers created by the presence of illegal drugs in our public schools. Not only do drugs pose a threat to the students but also the presence of students under the influence of drugs creates serious problems for teachers and other school personnel charged with the duty of educating and safekeeping our children during school hours."). However, we agree with the Commonwealth Court plurality and concurrence below that the means chosen by this District to effectuate that general policy are unreasonable given the

heightened protection of privacy under the Pennsylvania Constitution.

This case has been presented procedurally to this Court on preliminary objections. The District at this stage of the matter has offered no reason to believe that a drug problem actually exists in its schools, much less that the means chosen to address any latent drug problem would actually tend to address that problem, rather than simply coerce those students who would have the most to lose if they violated or challenged the policy. This case thus stands in stark contrast to *Vernonia*. Policy 227 was not adopted by a school district at its "wit's end" as a last-ditch effort to address a pervasive and disruptive "drug culture" which other, lesser measures had failed to eradicate. To the contrary, the most that the District proffered was "publicity" in the form of a local newspaper article reporting on a single, $3 drug sale that took place at the Delaware Valley High School in the past year—an article that does not address whether the students involved were athletes, drivers, or participants in extracurricular activities. Moreover, the District does not claim that the particular students selected for these random intrusions were likely to be drug users, much less that they were the leaders of a scholastic "drug culture." In addition, while the policy targeted some students who were involved in activities where drug or alcohol use presents an inherent danger (*e.g.*, student athletes and drivers), it included others involved in activities where no such inherent physical danger exists (*e.g.*, other extracurricular programs in which Jennifer Lynn Theodore participated, such as the National Honor Society, Science Olympiad and Scholastic Bowl). Finally, Policy 227 entirely ignored another segment of the school population which was probably more likely to be involved with drugs, *i.e.*, student slackers who chose to be completely uninvolved in any extracurricular activities whatsoever. As Justice Ginsburg noted in her *Earls* dissent:

Nationwide, students who participate in extracurricular activities are significantly less likely to develop substance abuse problems than are their less-involved peers. *See, e.g.,* N. Zill, C. Nord, & L. Loomis, Adolescent Time Use, Risky

Behavior and Outcomes 52 (1995) (tenth graders "who reported spending no time in school-sponsored activities were . . . 49 percent more likely to have used drugs" than those who spent 1–4 hours per week in such activities).

536 U.S. at 853, 122 S.Ct. at 2577. Even if bootstrapping from a general perception of a youth drug problem in America warrants an assumption that some general drug problem exists in every school district, the under-inclusive and over-inclusive means chosen by the District here are not an efficacious manner of addressing that generic concern.

 On this question of need and efficacy, the program also stands in sharp contrast to *In re F.B.* A point of entry search of all students unquestionably is an effective means of furthering a compelling interest—eradicating weapons from schools. Although we do not for a moment downplay the seriousness of student use of drugs and alcohol, in this post-Columbine High School era otherwise-undetected alcohol and drug use by some students does not present the same sort of immediate and serious danger that is presented when students introduce weapons into schools. But, even if it did, the over- and under-inclusive means chosen by the District are not likely to accomplish the objective. In light of the nature of the intrusion authorized by Policy 227 and the heightened right to privacy recognized under the Pennsylvania Constitution, we hold that such a search policy will pass constitutional scrutiny only if the District makes some actual showing of the specific need for the policy and an explanation of its basis for believing that the policy would address that need. In forwarding its preliminary objection here, the School District made no such showing, electing instead to argue that the general need to deter drug use, in and of itself, justifies random testing of only those students who participate in extracurricular activities.

Were the suspicionless drug and alcohol testing in this case confined to student-athletes and students with driving/parking privileges, the question obviously would be closer. Policy 227, however, captures students involved in all extracurricular activities. Students in the band, chess club, drama club, or

academic clubs simply do not pose the same sort of danger to themselves or others:

> Schools regulate student athletes discretely because competitive school sports by their nature require communal undress and, more important, expose students to physical risks that schools have a duty to mitigate. For the very reason that schools cannot offer a program of competitive athletics without intimately affecting the privacy of students, *Vernonia* reasonably analogized school athletes to "adults who choose to participate in a closely regulated industry." 515 U.S. at 657, 115 S.Ct. 2386, [2393,] 132 L.Ed.2d 564 (internal quotation marks omitted). Industries fall within the closely regulated category when the nature of their activities requires substantial government oversight. *See, e.g., United States v. Biswell,* 406 U.S. 311, 315–16, 92 S.Ct. 1593, [1596,] 32 L.Ed.2d 87 (1972). Interscholastic athletes similarly require close safety and health regulation; a school's choir, band and academic team do not.

*Earls,* 536 U.S. at 846, 122 S.Ct. at 2573 (Ginsburg, J., dissenting). As Justice Ginsburg further noted, random drug testing of all students involved in extracurricular activities is too far-reaching to be characterized as reasonable:

> Although "special needs" inhere in the public school context ..., those needs are not so expansive or malleable as to render reasonable any program of student drug testing a school district elects to install. The particular testing program upheld today is not reasonable, it is capricious, even perverse: Petitioner's policy targets for testing a student population least likely to be at risk from illicit drugs and their damaging effects.

*Id.* at 843, 122 S.Ct. at 2572 (internal quotation marks and citations omitted).

In short, Policy 227 cannot be deemed constitutional on its face because it authorizes a direct invasion of student privacy, with no suspicion at all that the students targeted are involved with alcohol or drugs, or even that they are more likely to be involved than the students who are exempted from the policy. The policy stands in stark contrast to the policy approved in

*Vernonia,* where a drug culture led by the targeted student-athletes, who already had a lesser expectation of privacy, was proven to exist in the school.

Further support for the conclusion that Policy 227 cannot be deemed reasonable on its face may be found by considering the particularized showing that was made by a school district whose random drug testing program was recently challenged in the New Jersey Supreme Court. In *Joye v. Hunterdon Central Regional High School Board of Education,* 176 N.J. 568, 826 A.2d 624 (2003), a sharply divided (4–3) Supreme Court upheld against a state constitutional challenge a random drug and alcohol testing program which was similar to Policy 227 *i.e.,* it targeted students engaged in any extracurricular activity as well as students with parking privileges. The program in *Joye,* like the program in *Vernonia,* was adopted in response to a documented drug problem within the high school. The district had documented this active substance abuse problem through anonymous but controlled surveys of students which indicated that a high percentage of those students had recently used illegal drugs or alcohol, as well as "certified statements from school personnel describing first-hand experiences with students using drugs or alcohol" at the high school. *Id.* at 627, 645–46. The school also produced evidence of, *inter alia,* the principal's personal knowledge of two students snorting heroin on school premises; expressions of concern from coaches, teachers and administrators about what they perceived to be a growing drug problem; a student assistance counselor's statement indicating an increase in the drug-related workload of at least thirty-three percent in a three-year period, mostly involving athletes and students involved in other extracurricular activities; three heroin overdose deaths in municipalities served by the school district; and four students who had ingested drugs while on school premises in 2000, the very year the challenged policy became effective. *Id.* at 646. The Court noted that the "facts described in the certifications, ... together with the survey results, ... demonstrate the scope of the school's problem." *Id.*

In addition to the fact that the school district in *Joye* was responding to an actual, documented problem within a particular school, the court emphasized the incremental and inclusive approach the district had taken to address that problem. The program was adopted as a result of a "meticulous two-year process" which included appointing a community task force, which was comprised of student representatives, parents, the booster club, school counselors, school administration, teachers, coaches, and drug testing experts. The task force evaluated the existing substance-abuse programs at the school (including an existing suspicion-based drug-testing program as well as program which randomly tested student athletes for drugs); collected information on reported day-to-day drug and alcohol problems among students in the school; and solicited public input by writing to parents and holding a public meeting. It was this task force which initially recommended expanding the existing random drug-testing policy from student-athletes to include students holding parking permits and students engaged in other extracurricular activities. Even then, the school district did not simply adopt such a policy but, instead, it held further public hearings and attempted to gauge then-existing drug use among the high school's students by conducting a follow-up survey and consulting again with other school personnel about the persistence of the problem. The school district determined that drug use had declined, in part, due to the very success of the random drug testing of student athletes (thus suggesting the efficacy of that program), but that it was still unacceptably high. It was only then that the school district adopted and implemented the recommendation of the task force. *Id.* at 627–30. In later defending the policy, the president of the School Board noted that, although in his experience parents tended to react openly when they disagreed with a school policy, only three students and their parents (in a district representing approximately 2,500 students) had opposed this program. *Id.* at 632.

On the basis of this record, the *Joye* Majority held that the program was both reasonable and constitutional because it "represent[ed] a rational attempt by those officials and by

approving parents to address a documented problem of illegal drug and alcohol use affecting a sizable portion of the student population." *Id.* at 627. The court also specifically left open the prospect that a similar program at another school might not pass constitutional muster if, among other things, "the underlying drug and alcohol use at the particular school is simply inadequate to justify it." *Id.* at 627. *See also id.* at 653 (to have similar programs deemed constitutional, other New Jersey schools "will have to base their intended programs on a meticulously established record, similar to the record here").

*Joye* differs from this case, of course, in that it was decided on a developed factual record while this case is currently in the preliminary objections phase. It may be that, upon the trial of the matter, the District can produce evidence of an existing drug problem as well as the success and/or failure of other means adopted to eradicate the problem, along the lines of that which ultimately convinced a majority of the New Jersey Supreme Court. But, for purposes of its preliminary objections, the District has forwarded only its argument that the general need to deter drug use among students authorized it to target these select students. We hold that those generic factors alone do not justify any and all drug testing programs for purposes of Article I, Section 8.

Although we recognize that this case is still in the preliminary objections phase, we would be remiss not to offer some view on the assumption, as reflected in the statement of purpose for the District's policy, that it is constitutionally reasonable to target and make an example of some students, not because they have an existing drug or alcohol problem or because they are more likely than others to have or develop one, but because by driving or engaging in any extracurricular activity, they have assumed the mantle of "student leaders" and "role models." The theory apparently is that, even in the absence of any suspicion of drug or alcohol abuse, it is appropriate to single these students out and say, in effect: "Choose one: your Pennsylvania constitutional right to privacy or the chess club (or the homemakers' club, or cheerlead-

ing, or the Science Olympiad, or the band, or the Spanish club, etc.)." This choice is to be foisted upon the unwilling student—who really may simply enjoy chess, or cooking, or cheerleading, or science, or playing the tuba, or speaking Spanish, or associating with other children and young adults who share similar interests. Or, the student may have an eye on extracurricular activities that prospective colleges look for in reviewing student applications. *See Earls,* 536 U.S. at 846, 122 S.Ct. at 2573 (Ginsburg, J., dissenting) ("Participation in [extracurricular] activities is a key component of school life, essential in reality for students applying to college"). The District apparently believes that this forced choice is reasonable for symbolic purposes: the student may then be held up as an example to others more at risk, but who themselves are spared the choice. If such deterrence by example is the aim, it hardly seems likely that the District will be able to prove the effectiveness of this policy in achieving the stated purpose, since it "invades the privacy of students who need deterrence least, and risks steering students at greatest risk for substance abuse away from extracurricular involvement that potentially may palliate drug problems." *Id.* at 853, 122 S.Ct. at 2577.

Given the daily news reports from around the country, there is no doubt that this School District is sincere in its struggle to make decisions about how best to nurture notions of leadership and responsible citizenship and in discharging the awesome task of molding and shaping our youth to meet the modern challenges of our society. But, part of citizenship is also a respect for this Nation's fundamental freedoms, freedoms which many young Americans, not much older than these students, have so often been called upon to defend overseas at very real risk to life and limb. These recent graduates are fighting, in part, for a right of privacy and self-determination that our adversaries despise. As Justice Louis D. Brandeis observed:

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of

laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.

*Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). *See also Earls,* 536 U.S. at 855, 122 S.Ct. at 2578 (Ginsburg, J., dissenting) (" 'That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.' "), *quoting West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). What lesson does a program targeting the personal privacy of some but not all students, and lacking both individualized suspicion or any reasoned basis for a suspicionless search, teach our young? When such a program directly implicates a fundamental right guaranteed, even to youthful citizens, under our Constitution, there must be a strong justification, grounded in fact, for the policy. *See Earls,* 536 U.S. at 846, 122 S.Ct. at 2573–74 (Ginsburg, J., dissenting) ("Enrollment in a public school, and election to participate in school activities beyond the bare minimum that the curriculum requires, are indeed factors relevant to reasonableness, but they do not on their own justify intrusive, suspicionless searches."). Even apart from constitutional concerns, schools might want to avoid conveying a message of constitutional suspicion and cynicism rather than one of responsible citizenship.

On the current state of this record, the suspicionless search policy at issue has not been supported by sufficient proof that there is an actual drug problem in the Delaware Valley School District; by individualized proof that the targeted students are at all likely to be part of whatever drug problem may (or may not) exist; or by reasonable proof that the policy actually addresses whatever drug problem may exist. Because the policy is not so supported, we hold that the Commonwealth

Court correctly reinstated the complaint filed on behalf of the affected students.

Turning to the cross-appeal, appellees alleged in their complaint that, by establishing a program of mandatory counseling based upon a positive test result, Policy 227 violates their right as parents to make decisions involving their children's health care, education, and upbringing. Appellees also claim that their privacy interests in the results of a positive drug test are compromised because the results are disclosed to school officials. The District disputes both arguments. As these students both tested negative, any controversy respecting the parental rights complaint is abstract, hypothetical and remote and, as such, is not ripe for decision. *See Empire Sanitary Landfill, Inc. v. Commonwealth, Dep't of Envtl. Resources*, 546 Pa. 315, 684 A.2d 1047, 1054 (1996). Accordingly, the Commonwealth Court properly affirmed the dismissal of this claim.

For the foregoing reasons, the decision of the Commonwealth Court is affirmed.

Justice SAYLOR files a concurring opinion in which Justices NIGRO and EAKIN join.

Justice SAYLOR, concurring.

I agree with the majority that the trial court should not have sustained the School District's preliminary objections in the nature of a demurrer on the present record, and that the case must therefore be remanded for further proceedings. I write separately, however, because I am less certain than the majority that the School District's decision, as memorialized in Policy 227, to target for random drug testing only student drivers and extracurricular participants (the "covered students") constitutes a facially unreasonable approach.

The majority goes to some length to discredit the School District's decision to test only the covered students. *See, e.g.,* Majority Opinion, at 92 ("Even if bootstrapping from a general perception of a youth drug problem in America warrants an assumption that some general drug problem exists in every

school district, the under-inclusive and over-inclusive means chosen by the District here are not an efficacious manner of addressing that generic concern."). *See generally id.* at 95 (suggesting that the School District's only motive for testing the covered students was symbolic, and that it will therefore be unable to prove that its policy is efficacious). Initially, I note that, inasmuch as the case is being remanded for the development of proof regarding questions of the nature and extent of the drug abuse problems faced by the School District, and the effectiveness of its chosen mechanism for addressing such issues, any pronouncements at present by this Court concerning the overall reasonableness or effectiveness of Policy 227 seem premature.

Secondly, it bears clarification that there does not appear to be any genuine dispute that there may be some particularized need for testing among a definable sub-class of the covered students, such as athletes and drivers. Thus, the aspect of the program to which the majority appears to object most strongly concerns the decision to test all extracurricular participants, rather than athletes and drivers only.[1] While the majority views such an approach as constituting a cynical means of coercion, *see, e.g., id.* at 91, 95–96, the policy may be supported by other good-faith reasoning.[2] To understand why, it is first helpful to consider the context in which the evaluation of the challenged policy must take place.

In the school search setting, the Article I, Section 8 inquiry mirrors in significant respects the Fourth–Amendment test developed by the United States Supreme Court: both formulations reflect a balancing scheme in which the value that

1. I take this opportunity, as well, to distance myself from the majority's branding as "student slackers" those individuals who elect not to become involved in extracurricular activities. *See id.* at 92. There are any number of legitimate life issues that could make it more difficult for some students to spend time in these voluntary activities than others, and I fail to see the value or propriety of this Court's attaching a pejorative label to such persons.

2. Indeed, that this same policy has been adopted by many school districts throughout the country—and has largely survived judicial review, *see infra*—at a minimum militates in favor of exercising caution before deeming the School District's approach facially unreasonable.

society places on protecting students from invasions of privacy competes with the value that society places on the school's ability to protect student health and maintain an appropriate learning environment. *Compare New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985) (noting that the determination of Fourth Amendment reasonableness "requires balancing the need to search against the invasion which the search entails") (internal quotation marks omitted), *with In re F.B.*, 555 Pa. 661, 667, 726 A.2d 361, 365 (1999) (delineating a multi-pronged test in which students' privacy interests are weighed against the government's "overall purpose" and "immediate reasons" for conducting the search). *See generally Commonwealth v. Blouse*, 531 Pa. 167, 169, 611 A.2d 1177, 1178 (1992) (recognizing that, in reviewing a suspicionless search under Article I, Section 8, the intrusion upon the individual is balanced against the government's promotion of legitimate interests). Thus, before assessing the School District's decision to search the covered students in particular, it is relevant to review the severity of the district's need to ameliorate or deter drug and alcohol abuse among the students under its care. In this regard, I note that, although the students' privacy interests are given greater weight under Article I, Section 8 of the Pennsylvania Constitution than under its federal counterpart, *see F.B.*, 555 Pa. at 668, 726 A.2d at 365; *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), it does not follow that the governmental interests at stake are in any way diminished.

In analyzing the strength of the governmental interest served by the challenged drug search policy, this Court's recent opinion in *F.B.* provides some guidance. As the majority indicates, *F.B.* involved a weapons search of all students entering a public high school. In upholding the search, this Court stated that the government's need to keep weapons out of school is "obvious" and that schools are "not required to wait for a tragedy to occur within their walls to demonstrate that the need is immediate." *Id.* at 673, 726 A.2d at 367. Here, the need to deter drug use among students appears equally obvious, and, as in *F.B.*, those reasons comport with

the school's duty to keep its students safe and to maintain an appropriate environment for learning. In this regard, the United States Supreme Court has indicated as follows:

> That the nature of the concern is important can hardly be doubted. Deterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs, which was the governmental concern in [*National Treasury Employees Union v.*] *Von Raab* [, 489 U.S. 656, 668, 109 S.Ct. 1384, 1392, 103 L.Ed.2d 685 (1989)], or deterring drug use by engineers and trainmen, which was the governmental concern in *Skinner*[ *v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 628, 109 S.Ct. 1402, 1419, 103 L.Ed.2d 639 (1989)]. School years are the time when the physical, psychological, and addictive effects of drugs are most severe. "Maturing nervous systems are more critically impaired by intoxicants than mature ones are; childhood losses in learning are lifelong and profound"; "children grow chemically dependent more quickly than adults, and their record of recovery is depressingly poor." ... And of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted.

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661–62, 115 S.Ct. 2386, 2395, 132 L.Ed.2d 564 (1995) (citation omitted). Seven years later, the Court continued:

> This Court has already articulated in detail the importance of the governmental concern in preventing drug use by schoolchildren. The drug abuse problem among our nation's youth has hardly abated since *Vernonia* was decided in 1995. In fact, evidence suggests that it has only grown worse. As in *Vernonia*, "the necessity for the State to act is magnified by the fact that this evil is being visited not just upon individuals at large, but upon children for whom it has undertaken a special responsibility of care and direction." [*Vernonia*, 515 U.S.] at 662, 115 S.Ct. [at 2395]. The health and safety risks identified in *Vernonia* apply with equal force to Tecumseh's children. Indeed, the nationwide drug

epidemic makes the war against drugs a pressing concern in every school.

*Board of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 834, 122 S.Ct. 2559, 2567, 153 L.Ed.2d 735 (2002). Thus, the governmental interest in reducing or preventing drug use among the School District's pupils is important, if not compelling, in that it is ultimately not only to maintain an environment in which learning can take place and to take reasonable precautions designed to promote the students' safety and well-being while in school, but to protect children from suffering the life-long effects of drug addiction. A significant question, then, is whether selecting only the covered students for testing can be an efficacious means of serving that objective.

The Commonwealth Court plurality indicated (and this Court's majority appears to agree) that the School District acted unreasonably in selecting the covered students for testing because there was no showing that those students are in greater need of monitoring than other students; it suggested that Policy 227 was analogous to a decision to vaccinate only the covered students for Polio without demonstrating that they were more likely than other students to contract that disease. *See Theodore v. Delaware Valley Sch. Dist.*, 761 A.2d 652, 661 (Pa.Cmwlth.2000). Likewise, the *Earls* dissenters suggested (and, again, the majority agrees) that, because of the lack of any particularized need relative to extracurricular participants, the school district had in reality undertaken to send a merely symbolic anti-drug message unsupported by special needs.

I cannot conclude, however, that the School District's decision to test only the covered students absent any risk- or conduct-related basis (besides guarding athletes and drivers against special risks associated with their activities) necessarily lacks any logical or reasoned basis. Rather, I believe that several factors beyond symbolic considerations could support the district's approach. For example, in upholding a similar drug testing policy, the Indiana Supreme Court recently noted that

greater ranges of activities occur during extracurricular activities than during normal school hours.... There are many more ways for a student to be injured, to endanger fellow students, to transgress school rules, or to violate the law while participating in an extracurricular off campus event (such as a band competition in another city or a non-curricular field trip) than during the relative order of school hours.... If drug abuse increases the physical danger of participation in a school-sponsored activity, a school corporation's interest in deterring drug abuse becomes stronger.

*Linke v. Northwestern Sch. Corp.*, 763 N.E.2d 972, 984 (Ind. 2002). Accordingly, the Indiana policy was deemed to fall with the scope of the school district's latitude in "experimenting with methods to deter drug use." *Id.* at 984. Additionally, the New Jersey Supreme Court has found that the enhanced school district liability and reduced privacy expectations associated with virtually all extracurricular activities rendered reasonable the school district's decision to monitor extracurricular participants only:

Student-athletes must have a preseason physical, acquire insurance coverage or sign an insurance waiver, and comply with rules of conduct, dress, grade point average, training hours and other rules as may be established for each sport. Students engaged in extracurricular activities often must also obtain insurance or sign insurance waivers for any extracurricular activity that extends the school's liability beyond the normal school-context, such as field trips, outings, events, conferences, and competitions away from school. They may have to subscribe to additional requirements, such as when the activities have required attire, training rules, or hours of practice and rehearsal, or other general regulations. Some extracurricular activities will not have the same elements of lack of privacy such as the communal undressing and locker room as athletics, but many extracurricular activities have elements of shared exposure to other student participants when performing specified activities such as the putting on of an organiza-

tion's uniforms, or the general need to change into different required clothes for a particular event.

*Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ.*, 176 N.J. 568, 826 A.2d 624, 642–43 (2003); *see also id.* at 645–48 (surveying empirical studies tending, on balance, to show that random drug testing programs in schools which target extracurricular participants have a salutary effect in reducing even the temptation to use drugs, as the students become aware that there are negative consequences associated with drug use, "such as having their parents know and disapprove of it or losing the ability to participate in desired extracurricular activities").

Other considerations, as well, may support the School District's decision to test only the covered students. For example, because school attendance is compulsory, *see* 24 P.S. § 13–1327, limiting testing to students involved in strictly voluntary activities may serve to avoid a possible Fourth Amendment violation. *See Tannahill v. Lockney Indep. Sch. Dist.*, 133 F.Supp.2d 919, 929 (N.D.Tex.2001) (invalidating, under the Fourth Amendment, a random drug testing policy applicable to all students, and noting that "compulsory attendance at school is much different than voluntary participation in extracurricular activities"); *see also Vernonia*, 515 U.S. at 657, 115 S.Ct. at 2393 (indicating that student athletes' Fourth Amendment privacy interests are affected by having volunteered for an already regulated activity); *Earls*, 536 U.S. at 831–32, 122 S.Ct. at 2565–66 (same as regards students involved in non-athletic extracurricular activities); *Linke*, 763 N.E.2d at 981 (same). *See generally Earls*, 536 U.S. at 841, 122 S.Ct. at 2571 (Breyer, J., concurring) (stating that, by not subjecting the entire school to testing, the policy "preserves an option for a conscientious objector[:][h]e can refuse testing while paying a price (nonparticipation) that is serious, but less severe than expulsion from the school"). Indeed, in the only reported state court decision striking down a drug testing policy similar to the one here at issue, the fact that the policy targeted some students who participated in activities for which academic credit was awarded was a factor in the court's

disposition. *See Trinidad Sch. Dist. No. 1 v. Lopez*, 963 P.2d 1095, 1110 (Colo.1998).

Finally, although Appellees have not raised any equal protection claim, the gravamen of their objection to Policy 227 rests with the assertion that, absent proof that the covered students are in special need of monitoring, the classification drawn by the School District is not a reasonable one. In this regard, principles concerning legislatively-drawn classifications as analyzed against equal protection guarantees are applicable. Centrally, it has been recognized that such classifications need not be a "perfect fit" relative to the problem they are intended to address. *See Justiana v. Niagara County Dep't of Health*, 45 F.Supp.2d 236, 242 (W.D.N.Y. 1999). Rather, "a legislature can address a perceived problem incrementally if in its judgment that is the best way to address the problem." *Id.* As the Supreme Court has noted:

> "The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies.... Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination."

*Federal Communications Comm'n. v. Beach Communications, Inc.*, 508 U.S. 307, 316, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993) (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955)); *see also Brazil–Breashears v. Bilandic*, 53 F.3d 789, 793 (7th Cir.1995) (indicating that the government need not comprehensively attack an identified vice, but that it "must be allowed leeway to approach a perceived problem incrementally").[3] While there is, admittedly, a difference between an

**3.** *See also Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (indicating that a classification does not violate equal protection simply because it "is not made with mathemati-

imperfect fit and no fit at all, for the reasons expressed above there is presently some correlation between the problem of student drug abuse and the classification drawn by the School District. In all events, it should be recognized that successfully eliminating drug use among the students covered by Policy 227 would ensure that at least a substantial portion of the student population is drug-free. *Cf. Theodore,* 761 A.2d at 667 (Leadbetter, J., dissenting) (opining that "[t]he district's interest in protecting the health and safety of the school community is in no way diminished by the fact that it has attempted to limit the intrusiveness of its program by testing only those students who voluntarily participate in elective activities"); *Weber v. Oakridge Sch. Dist. 76,* 184 Or.App. 415, 56 P.3d 504, 518 (2002) ("Merely because a means selected to accomplish an end is underinclusive ... does not mean that it is unreasonable.").

It is possible that, on remand, the School District will be able to demonstrate the existence of a significant drug problem among its pupils, but will nonetheless be unable to show that the covered students abuse drugs at a greater rate than the remainder of the student population. In this event, and for the reasons expressed above, such failure should not necessarily be fatal to the constitutionality of Policy 227. Rather, the determination of whether Policy 227 is likely to be efficacious in serving the School District's interest in reducing or preventing drug abuse generally among its students is a matter for the trial court, sitting as fact finder, to determine in the first instance in consideration of all of the circumstances. In this regard, I note that, contrary to the majority's apparent skepticism regarding the efficacy of selecting extracurricular participants for random drug testing, other courts have recognized that such an approach can be helpful in ameliorating drug abuse among students. *See supra* (citing *Joye,* 826 A.2d at 645–48). More broadly, it is worth stating that the determi-

cal nicety or because in practice it results in some inequality" (internal quotation marks omitted)); *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913) (stating that "[t]he problems of government are practical ones and may justify ... rough accommodation").

nation of constitutional reasonableness does not hinge upon efficacy alone. As the New Jersey Supreme Court has recognized:

> Reasonableness in this context does not require that the Board possess irrefutable proof verifying the efficacy of random drug and alcohol testing in reducing substance abuse among students. Rather, it is enough that the Board believed that its program would have some measurable effect in attaining the Board's objectives. Those objectives include not only deterring drug and alcohol use, but encouraging those who test positive for such use to participate in rehabilitative programs.

*Joye*, 826 A.2d at 646.

Finally, and consistently with the above, I note that, in setting forth the holding of this case, the majority is careful not to impose an absolute requirement that the School District make any particular showing of a special need as to the covered students only. *See, e.g.*, Majority Opinion, at 92 (holding that the search policy at issue will be deemed constitutional if the School District shows a need for it and explains its basis for believing that it will be effective); *id.* at 94 (noting that at trial the School District may prevail if it produces evidence of a drug problem and other evidence along the lines of that which was of record in *Joye*). Indeed, the majority draws heavily upon the New Jersey Supreme Court's reasoning in *Joye, see id.* at 93–95, a case in which there was a developed factual record concerning the extent of the drug problem within the school district, but little or no proof that the targeted student drivers and extracurricular participants were any more at risk of drug abuse than the rest of the student community.[4] Accordingly, I am able to concur in the result reached by the majority, namely, remanding the case for further factual development without specifically requiring that the School District proffer evidence of a heightened risk

4. The salient finding of *Joye* was of "illegal drug and alcohol use affecting a sizable portion of the student population," *Joye*, 826 A.2d at 646, and not that there was some demonstrated relationship between extracurricular activities and a heightened risk of drug activity.

among the covered students as compared to the student population as a whole.

Justice NIGRO and Justice EAKIN join this concurring opinion.